**RESERVE SUPPLY CORPORATION,**
Plaintiff–Appellant,

v.

**OWENS–CORNING FIBERGLAS COR-PORATION and CertainTeed Corpora-tion, Defendants–Appellees.**

No. 91–1154.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 27, 1991.

Decided Aug. 4, 1992.

Robert N. Sodikoff, Charles E. Zeitlin, Greenberg, Keele, Lunn & Aronberg, and Richard P. Campbell, and Anthony S. Divincenzo (argued), Campbell & Divincenzo, Chicago, Ill., for plaintiff-appellant.

Jeffrey L. Dorman, Earl E. Pollock, Blake L. Harrop, Robert T. Joseph, Sonnenschein, Nath & Rosenthal, and David F. Graham, Pamela R. Hanebutt and Douglas F. Fuson (argued), Sidley & Austin, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr.*, RIPPLE, and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

Reserve Supply Corporation (Reserve) appeals a grant of summary judgment in favor of Owens–Corning Fiberglas Corporation (Owens–Corning) and CertainTeed Corporation (CertainTeed). The district court determined that Owens–Corning and CertainTeed did not conspire to fix prices in the residential fiberglass insulation market in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, para. 261, *et seq.* It also determined that Owens–Corning and CertainTeed had a good faith belief that the discriminatory prices for insulation that they offered Builders Marts of America (BMA) were warranted by competitive circumstances and that, consequently, their conduct was shielded from liability under the Clayton Act, as amended by the Robinson–Patman Act, by that statute's "meeting competition" defense. 15 U.S.C. § 13(b). For the reasons given below, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. *Facts*

This case involves pricing practices in the fiberglass insulation industry. Reserve is a lumber dealer cooperative based in Illinois, which purchased fiberglass insulation. Owens–Corning and CertainTeed are large insulation manufacturers, which, along with Johns–Manville, held 85 to 90 percent of the market share in the period between 1979 and 1983.

Reserve brings two distinct claims. First, it alleges that Owens–Corning and CertainTeed offered discriminatorily low prices to Reserve's competitor, BMA, in the spring and summer of 1979. Second, Reserve contends that Owens–Corning and CertainTeed conspired to fix prices generally in the fiberglass insulation market. The facts relevant to one claim are not necessarily relevant to the other. Consequently, for the sake of clarity, we shall provide a statement of the facts related to each claim as that claim is discussed. Nonetheless, some background common to both claims ought to be set forth at this point.

Fiberglass insulation is an essentially homogeneous product which is marketed in standard sizes, grades ("R-values"), and formats. There is little or no functional difference between the insulation that Owens–Corning and CertainTeed sold. At the time relevant to this dispute, Owens–Corning and CertainTeed priced insulation according to an identical method: each company made available to its customers a list price for various types of insulation; it then provided standard discounts off this price based on the type of customer who was purchasing. According to the record, it appears that discounts were the practice, not the exception; apparently every cus-

---

\* Judge Wood assumed senior status on January 16, 1992, which was after oral argument in this case.

tomer received one of these standard discounts. In addition, both suppliers provided extraordinary discounts to certain customers in order to meet the prices of competitors.

When they were offered lower prices for insulation from other suppliers, purchasers made it a practice to inform suppliers in the hope of obtaining the same price from them. Consequently, pricing information was widely disseminated throughout the industry. Because of this readily available information, the fungibility of the product, and the relatively small number of producers, the market for insulation was "interdependent." That is, each producer had to take into account the conduct of its competitors when it priced its product, and it could not maintain a higher price without losing its market share.[1] Demand for insulation was tied substantially to the level of housing starts, and was therefore relatively inelastic. An industrywide drop in the price of insulation would not have translated necessarily into a commensurate increase in industrywide sales.

### B. *District Court Proceedings*

In June 1983, Reserve filed a three-count complaint against Owens–Corning and CertainTeed. Count One alleged a conspiracy or agreement to restrain trade in the fiberglass insulation market, in violation of section 1 of the Sherman Act. 15 U.S.C. § 1. Count Two alleged discriminatory pricing on the part of Owens–Corning and CertainTeed by charging discriminatorily lower prices for insulation products to competitors of Reserve, in violation of section 2(a) of the Clayton Act, as amended by the Robinson–Patman Act. 15 U.S.C. § 13(a). Finally, Count Three asserted, as a pendent state claim, that Owens–Corning and CertainTeed's alleged price fixing also violated the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, para. 261, *et seq.*

In 1986, the district court (Duff, J.) granted CertainTeed's motion for summary judgment on the Robinson–Patman claim.

*Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 639 F.Supp. 1457 (N.D.Ill. 1986). In 1990, the court (Alesia, J.) granted summary judgment to Owens–Corning on the Robinson–Patman claim, and to both defendants on the price-fixing claims. *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 1992–1 Trade Cas. (CCH) ¶ 69,304, 799 F.Supp. 840 (N.D.Ill.1990). We shall discuss each of these holdings as we address the merits of each claim.

## II

### THE ROBINSON–PATMAN CLAIM

Count Two of Reserve's complaint alleged that Owens–Corning and CertainTeed engaged in discriminatory pricing of insulation in sales to various competitors of Reserve. On appeal, Reserve challenges only the district court's finding of no illegal discrimination in sales that the defendants made to Builders Marts of America (BMA), a large building supplies dealer in the southeast United States.[2]

#### 1. Holding of the district court

As we have noted previously, summary judgment on this claim was granted for CertainTeed by the district court's (Duff, J.) order in 1986. For the purposes of ruling on this motion, the court assumed that Reserve had made out a prima facie case of price discrimination—that is, that CertainTeed had sold insulation at a price lower than that available to Reserve. However, the court ruled that, even if this discrimination had taken place, CertainTeed's conduct was not illegal because it was entitled as a matter of law to the "meeting competition" defense contained in section 2(b) of the Act. 15 U.S.C. § 13(b). With regard to sales to purchasers other than BMA, the court found that CertainTeed had followed company procedures designed to verify the existence of discounts reported by customers. This fact established that the lower prices it offered these customers were made with a good faith belief that they would meet a competitor's

---

**1.** *See, infra,* note 10.

**2.** In this appeal, Reserve does not challenge the district court's finding of no illegal price dis-

crimination by either CertainTeed or Owens–Corning in sales to customers other than BMA. Appellant's Br. at 11 n. 1.

lower price. *Reserve Supply Corp.*, 639 F.Supp. at 1465. The district court then held that, although CertainTeed did not employ fully these procedures when it gave a discriminatory discount to BMA, the circumstances surrounding this sale nonetheless demonstrated that CertainTeed believed in good faith that its discount would meet competition. Citing the indicia of good faith identified by the Supreme Court in *United States v. United States Gypsum Co.*, 438 U.S. 422, 455, 98 S.Ct. 2864, 2882, 57 L.Ed.2d 854 (1978), the court noted that BMA assured CertainTeed that the discount it sought was available in the market; that CertainTeed officials evaluated the reasonableness of this discount in light of market conditions; and that this discount actually met a comparable discount that BMA was then receiving from Owens–Corning. *Reserve Supply Corp.*, 639 F.Supp. at 1465–67.

Summary judgment in favor of Owens–Corning was granted by the district court's (Alesia, J.) order of 1990. As in the case of CertainTeed, the court assumed that Owens–Corning had offered discriminatory prices to its customers. Also, as in the case of CertainTeed, the court held that Owens–Corning's discount verification procedures entitled it to the meeting competition defense for sales made to purchasers other than BMA. With regard to sales to BMA, the court found that, before Owens–Corning had offered its discount, BMA had informed it of a comparable discount from CertainTeed, that BMA had threatened Owens–Corning with a loss of sales if that discount were not met, and that Owens–Corning had evaluated that discount against market conditions. The district court held that, under *United States Gypsum*, these facts demonstrated that Owens–Corning was entitled to the section 2(b) defense as a matter of law.

**2. Applicable standards**

█ Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), makes it illegal to discriminate in price between buyers when an injury to competition is the consequence. *United States v. United States Gypsum Co.*, 438 U.S. 422, 450, 98 S.Ct.

2864, 2880, 57 L.Ed.2d 854 (1978). In this case, all parties concede that both Owens–Corning and CertainTeed engaged in price discrimination when they granted a 16 percent discount to BMA that was not available to Reserve. However, both Owens–Corning and CertainTeed attempt to avoid liability by availing themselves of the affirmative defense contained in section 2(b) of the Act. 15 U.S.C. § 13(b):

> That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.

The burden of establishing the defense falls on Owens–Corning and CertainTeed. *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 451, 103 S.Ct. 1282, 1297, 75 L.Ed.2d 174 (1983).

The Supreme Court has held that the section 2(b) defense "at least requires the seller, who has knowingly discriminated in price, to show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 759–60, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945). The seller must demonstrate that its price was a good-faith response to a competitor's lower price. *Falls City*, 460 U.S. at 451, 103 S.Ct. at 1297. Subsequent cases have declined to craft a rigid test for the applicability of this defense. Instead, the Court has described it as

> "a flexible and pragmatic, not technical or doctrinaire, concept.... Rigid rules and inflexible absolutes are especially inappropriate in dealing with the § 2(b) defense; the facts and circumstances of the particular case, not abstract theories or remote conjectures, should govern its interpretation and application."

*United States Gypsum*, 438 U.S. at 454, 98 S.Ct. at 2882 (quoting *Continental Baking Co.*, 63 F.T.C. 2071, 2163 (1963)). How-

ever, in United States Gypsum, 438 U.S. at 454–55, 98 S.Ct. at 2882–83, the Court identified a number of factors that could be relevant to determining a seller's good faith, including (1) whether the seller had received reports of similar discounts from other customers, (2) whether the seller was threatened with a termination of purchases if the discount were not met, (3) whether the seller made efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data, and (4) whether the seller had past experience with the buyer. In the end, "[t]he good-faith standard remains the benchmark against which the seller's conduct is to be evaluated." Id. at 454, 98 S.Ct. at 2882.

This case is before us after Owens–Corning and CertainTeed prevailed on motions for summary judgment. Our review is therefore governed by the standards of Fed.R.Civ.P. 56. We review de novo a district court's decision to grant summary judgment. Doe v. Allied–Signal, Inc., 925 F.2d 1007, 1008 (7th Cir.1991). As the moving parties, Owens–Corning and Certain-Teed were required to inform "the district court of the basis for its motion, and [to identify] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believe[d] demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). Furthermore, because Owens–Corning and CertainTeed also have the burden at trial of establishing good faith, they must establish affirmatively the lack of "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); see also Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1425 (11th Cir.1990); International Shortstop, Inc. v. Rally's, Inc.,

939 F.2d 1257, 1265 (5th Cir.1991), cert. denied, — U.S. ——, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992); Chanel, Inc. v. Italian Activewear of Florida, Inc., 931 F.2d 1472, 1477 (11th Cir.1991). In essence Owens–Corning and CertainTeed must show that the evidence of their good faith is "so one-sided that ... [they] must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251–52, 106 S.Ct. at 2512. Therefore, on this issue, the oft-quoted rule of Celotex with respect to the obligation of the nonmoving party which bears the burden of proof at trial is inapplicable.[3]

■ Finally, we must remember that courts traditionally have been quite circumspect in permitting a grant of summary judgment when claims of good faith and belief are involved—especially when the moving party has the burden of establishing that fact at trial. See International Shortstop, 939 F.2d at 1266 n. 8; Alan's of Atlanta, 903 F.2d at 1425–26; see also Munson v. Friske, 754 F.2d 683, 690 (7th Cir.1985); McMillian v. Svetanoff, 878 F.2d 186, 188 (7th Cir.1989); Randle v. LaSalle Telecom., Inc., 876 F.2d 563, 568 (7th Cir.1989). In Corrugated Paper Products, Inc. v. Longview Fibre Co., 868 F.2d 908, 914 n. 6 (7th Cir.1989), we suggested that "[w]here the burden of proof is on the movant with respect to state of mind or another issue as to which evidence is in the movant's exclusive control, the standards for a grant of summary judgment may differ." See also William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1047–48 (9th Cir. 1981) (refusing to direct a judgment on section 2(b) defense for baking company when there was an "admittedly small doubt" about its discount verification procedures), cert. denied, 459 U.S. 825, 103 S.Ct. 57, 58, 74 L.Ed.2d 61 (1982). While these latter considerations require our careful attention, we must also remember that certain characteristics of the "meeting competition" defense discussed previously make application of these summary judg-

---

**3.** See Celotex, 477 U.S. at 322, 106 S.Ct. at 2552 ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment ... against a [nonmoving] party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, *and on which that party will bear the burden of proof at trial.*") (emphasis supplied).

ment criteria somewhat more judicially manageable than might be the case in other contexts. In determining whether a competitor has made a good faith effort to meet a competitor's price, "the pragmatic nature of buyer-seller relationships in the market place" is the "touchstone of good faith standards."[4] "The test for determining when a seller has a valid meeting-competition defense is whether a seller can 'show the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor.'" *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 82, 99 S.Ct. 925, 934, 59 L.Ed.2d 153 (1979) (quoting *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 759–60, 65 S.Ct. 971, 977, 89 L.Ed. 1338 (1945)); *see also Rose Confections, Inc. v. Ambrosia Chocolate Co.*, 816 F.2d 381, 390 (8th Cir.1987); *Jones v. Borden Co.*, 430 F.2d 568, 572 (5th Cir.1970) (granting summary judgment in section 2(b) context in reliance on *A.E. Staley*). Reliance on such pragmatic criteria makes assessment of the defense considerably easier than it might otherwise be.

### 3. Analysis

Reserve contends that neither Owens–Corning nor CertainTeed has made a sufficient factual showing to entitle them to summary judgment on the section 2(b) defense. In evaluating this contention, we must determine whether Owens–Corning and CertainTeed have shown "the existence of facts that would lead a reasonable and prudent person to believe that [their] lower price would meet the equally low price of a competitor" and whether they have demonstrated that their "lower price was a good-faith response to a competitor's lower price." *Falls City*, 460 U.S. at 451, 103 S.Ct. at 1297. We must also keep in mind the indicia of good faith that the Court identified in *United States Gypsum*, 438

U.S. at 454–55, 98 S.Ct. at 2882–83, including the seller's past experience with the buyer, whether the seller had received reports of similar discounts in the market, whether the seller had been threatened with a termination of sales if the discount were not met, and whether the seller corroborated the reported discount by seeking documentary evidence or by appraising it in the light of market data. Because the question of whether the section 2(b) defense exists demands a "fact-specific" inquiry, *id.* at 454–55, 98 S.Ct. at 2882–83, we shall review in some detail the facts presented by the parties.

#### a. Owens–Corning's good faith

In early April 1979, Bill Lee, a BMA vice-president responsible for purchasing, contacted Charles Hartmann, the manager of Owens–Corning's Residential Insulation Distribution Marketing Division and the person within Owens–Corning who was responsible for approving pricing for BMA. BMA was a long-time established customer of Owens–Corning and had purchased over $9 million worth of building insulation in 1978. Hartmann had negotiated with BMA and Lee since 1976, and he believed Lee was trustworthy and a person of integrity. Lee also enjoyed respect generally within the building materials industry.

At the time of this conversation, Owens–Corning was selling insulation to BMA at a discount of 13 percent, which had been instituted to counter competition from Johns–Manville. During this conversation, Lee informed Hartmann that he had met with representatives of CertainTeed, and that CertainTeed was interested in selling insulation to BMA. Hartmann testified that he took contemporaneous notes of this conversation, and these notes show that Lee told Hartmann that CertainTeed had offered BMA a discount of 16 percent. An internal Owens–Corning "Special Approval Request" form[5] dated at roughly the same

---

4. Earl W. Kintner, *A Robinson–Patman Primer* 187 (1970).

5. The district court described the use of a "Special Approval Request" form in the following way:

Owens–Corning's regular practice required its sales representatives to complete "Special Approv[al] Requests" ("SARs") when deciding whether to partially or wholly meet a reported competitive offer. SAR's document information about the identities of customers and

time also reports the 16 percent discount to BMA. R.138; Goodwin Ex. at 5.[6]

Owens–Corning had found that its customers quickly reported any price reduction by one manufacturer to their other suppliers in order to obtain similar pricing from those other suppliers. As Owens–Corning points out, other customers reported 16 percent discounts from CertainTeed. R.164, Ex. A. Indeed, Reserve notes in its brief the existence of an alleged 16 percent discount to another customer. Appellant's Br. at 27 n. 3. Hartmann testified that, after receiving this report from BMA, he evaluated the credibility and reasonableness of the CertainTeed 16 percent discount in light of the price situation and competitive circumstances in the marketplace. He also stated that he looked at internal Owens–Corning Special Approval Request forms which detailed competitive offers in the marketplace. Although, because of the lapse of time, Hartmann could not remember specifically what he "did in this regard," he was sure that he followed his normal practice of satisfying himself that "the reported competitive situation did in fact, exist," and that Owens–Corning "was not offering any additional discounts more than necessary to retain the existing share of the business." R.135, Hartmann Aff. at ¶ 40; R.164, Hartmann Dep. at 172–74, 187–93. Hartmann also testified that he had further conversations with Lee in which he discussed the CertainTeed offer to determine if Lee's representations were consistent. During one of these conversations, Lee informed Hartmann that Owens–Corning would lose business unless it met the CertainTeed price.

In light of this reported discount, Owens–Corning increased its discount to BMA from 13 percent to 15 percent on May 25, 1979. This price change was made retroactive to May 1, 1979. On June 20, 1979, Owens–Corning increased its discount a further percentage point, from 15 percent to 16 percent. However, subsequent events revealed that the April report of the CertainTeed discount was erroneous. In fact, CertainTeed did not offer BMA a 16 percent discount on insulation until August 1979.

■ Although Owens–Corning was mistaken in believing that its 16 percent discount matched a discount provided by CertainTeed, it may still prevail on the section 2(b) defense if it can establish the existence of facts that would lead a reasonable and prudent person to believe that granting a lower price would in fact meet the equally low price of a competitor. *See Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69, 82–83, 99 S.Ct. 925, 934, 59 L.Ed.2d 153 (1979) ("Since good faith, rather than absolute certainty, is the touchstone of the meeting competition defense, a seller can assert the defense even if it has unknowingly made a bid that in fact not only met but beat his competition."). We believe that it has done so in this case, as a matter of law. Owens–Corning received a report from BMA, a respected long-time customer, that CertainTeed was offering a 16 percent discount on insulation products. It is also clear that other 16 percent discounts were reported in the market at that time, and that it was a practice in the industry for customers to relay quickly to a supplier news of available price reductions in order to gain similar reductions. Hartmann attested that he evaluated the reasonableness of the reported discount in light of market

competitors, competitive prices reported by a customer, and prices requested for approval by Owens–Corning sales representatives. If a sales representative recommended meeting a price, the representative forwarded a completed SAR to Owens–Corning's Toledo headquarters, where RIDMD [Owens–Corning's Residential Insulation Distribution Marketing Division] personnel could assess the reported competitive offer's credibility. If necessary, RIDMD sought further information from a customer.... Furthermore, Owens–Corning periodically reverified that competitors continued to offer the prices that Owens–Corning had elected to meet.

*Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 1992–1 Trade Cas. (CCH) ¶ 69,304 at 65,141 (N.D.Ill.1990), —— F.Supp. ——. These SARs were retained in Owens–Corning's files.

6. Also, Reserve states in its Local Rule 12(f) statement that Lee told Owens–Corning salesperson Dexter Goodwin in April 1979 that CertainTeed was offering a 16 percent discount to BMA. R.158 at ¶ 17.

conditions and believed that it was credible. He also believed that Lee would shift business away from Owens–Corning unless this discount were met.

Reserve raises a number of arguments to attempt to rebut Owens–Corning's showing of good faith. First, it claims that an issue of fact exists as to whether BMA actually ever reported a credible 16 percent discount to Owens–Corning. In support of this argument, it cites (1) deposition testimony by Lee that he had a "policy" not to divulge specific prices offered by specific vendors; (2) the fact that Owens–Corning did not increase its discount to BMA until May and June 1979; and (3) the fact that Owens–Corning salesman Dexter Goodwin did not refer to the 16 percent CertainTeed discount in an April 1979 report recommending continuing a 13 percent discount Owens–Corning provided BMA to counter competition from Johns–Manville. However, after examination of the record, we believe that these assertions do not create a genuine issue of material fact as to whether the discount was ever reported by BMA. *See Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510 (an issue of fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). Owens–Corning points to contemporaneous notes, internal documents, and sworn testimony demonstrating that a 16 percent discount was reported to it in April 1979. Reserve's contentions do not call this evidence into question. Lee's testimony that company policy discouraged giving detailed information on discounts does not constitute an assertion that he did not reveal price information to Owens–Corning. Indeed, Reserve's own pleadings, *see supra* note 6, state that Lee did not follow this policy on at least one occasion, when he informed Dexter Goodwin in April 1979 that CertainTeed was offering BMA a 16 percent discount.

Owens–Corning's lack of haste in lowering its price, standing alone, is, at best, ambiguous. Reserve suggests that the delay demonstrates that Hartmann did not believe Lee and was not worried seriously about losing BMA's business. Appellant's

Br. at 19. This is conjecture. Other explanations are just as plausible. A seller has the right to study and verification before acting and, indeed, Hartmann's affidavit and deposition state affirmatively that he did both. In similar vein, the fact that Owens–Corning raised the discount in stages does not place in question seriously the existence of the discount report. At best, it suggests only that Owens–Corning did not want to meet, or did not think it necessary to meet, the full cost of the discount immediately. Finally, the fact that the report of the 16 percent discount of CertainTeed was not mentioned in the April 1979 review of discounts to BMA is not probative, because that document's purpose was to confirm the existence of continuing competition from Johns–Manville at the 13 percent discount level.

Reserve next claims that Owens–Corning cannot establish its good faith because it cannot demonstrate that it was ever threatened with a loss of business if the CertainTeed 16 percent discount was not matched. *See United States Gypsum*, 438 U.S. at 455, 98 S.Ct. at 2882 (noting that one of the indicia of a seller's good faith under section 2(b) is whether it was "threatened with a termination of purchases if the discount was not met"). However, we believe that the record, read as a whole, places it beyond dispute that Owens–Corning believed it faced a loss of business if it did not provide a 16 percent discount. Hartmann stated in his affidavit that Lee explicitly warned him that business would shift to CertainTeed if BMA's discount were not increased. However, even if BMA's threat to take away business was not explicit, it was clearly implicit within the workings of the fiberglass insulation market. As Reserve admits, insulation customers had the habit of informing their suppliers of available discounts in order to obtain similar pricing. Also, Reserve concedes that Owens–Corning could not maintain a higher price than its competitors Johns–Manville or CertainTeed without a loss of business. Necessarily attendant with BMA's report of the 16 percent discount is the message that if that discount is not met, business

will shift to the competitor. *See Falls City*, 460 U.S. at 449, 103 S.Ct. at 1296 (stating that the section 2(b) inquiry "is guided by the standard of the prudent businessman responding fairly to what he reasonably believes are the competitive necessities").[7]

Reserve next argues that Owens–Corning has not demonstrated good faith because it cannot show that it evaluated the discount's reasonableness in light of market data. *See United States Gypsum*, 438 U.S. at 455, 98 S.Ct. at 2882 ("Efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data would also be probative" of good faith.). In support of this claim, Reserve first asserts that the 16 percent discount reported was a new low in the insulation market. It then argues that this fact, coupled with Hartmann's inability to testify to the particulars of his analysis of the discount, creates an issue of whether he adequately evaluated the discount at all. We note first that Reserve's claim that 16 percent was a new low discount is not borne out by the record. Both Owens–Corning *and* Reserve point out in their pleadings that 16 percent discounts, or their equivalent, were reported in the insulation market in the spring of 1979. Appellant's Br. at 27 n. 3; R.164, Ex. A. In addition, although Hartmann cannot testify as to precisely how he evaluated the discount, he did state in his deposition that he evaluated it in light of market conditions. The fact that Owens–Corning created a Special Approval Request form reporting the discount, as required by company antitrust compliance policy, buttresses Hartmann's testimony that some form of evaluation took place. Finally, we note that independent verification of a customer's (especially a long-time customer) representations of the competition's offer has not been required uniformly. *See, e.g., Great Atlantic & Pacific Tea Co.*, 440 U.S. at 83–85, 99 S.Ct. at 934–35; *Jones v. Borden Co.*, 430 F.2d at 572–74; *Cadigan v. Texaco, Inc.*, 492 F.2d 383 (9th Cir.1974).

### b. CertainTeed's good faith

In the spring and summer of 1979, CertainTeed and BMA entered into negotiations to purchase fiberglass insulation products. BMA had not purchased CertainTeed insulation previously, although CertainTeed's area salesperson, Alex McCaskill, had been attempting to gain BMA's business for several years. Negotiations took place between high-ranking officials of both companies; Director of Marketing George Hoffman and Marketing Manager for Residential Insulation Robert Mobley represented CertainTeed, and Vice-President Bill Lee negotiated on behalf of BMA. During the course of these negotiations, BMA suggested a discount of 16 percent on all fiberglass insulation products and an additional 2 percent off on two foil-backed products. Except for the additional 2 percent on the foil-backed products, it is undisputed that this discount met exactly the discount that BMA was then receiving from Owens–Corning. Hoffmann also testified that he expected the products on which the additional 2 percent was given would make up a small portion of the product mix.

It is disputed whether during negotiations Lee stated that Owens–Corning was offering BMA a discount equivalent to that which CertainTeed was being asked to meet. Mobley and Hoffmann stated that he did, and an internal CertainTeed doc-

---

7. Reserve also states that BMA explicitly told Owens–Corning that it would keep its purchases from CertainTeed to a minimum. R.158, Lee Dep. Ex. 6. Consequently, Reserve argues, BMA's business was secure at Owens–Corning, and it had no reason to drop its discount to meet a possible threat from CertainTeed. This statement hardly creates a genuine issue of triable fact. As a preliminary matter, it is contrary to Reserve's admissions that (1) purchasers actively disclosed discounts to their suppliers in order to acquire better prices and (2) that Owens–Corning could not maintain a higher price than Johns–Manville or CertainTeed without a loss of business. More importantly, this statement purportedly assuring Owens–Corning was made at the exact time that Owens–Corning agreed to offer the 16 percent discount, in June 1979, after it had already instituted the 15 percent discount. It therefore has little probative value.

ument prepared during the negotiation period shows that Lee identified Owens–Corning as the source of a 16 percent discount. Reserve contends that Lee never made this statement. It admits, however, that Lee told CertainTeed during negotiations that the price BMA was seeking was not "overly competitive," that is, that he "would not let them sell us at a price that was below prices that we had been quoted or prices that we felt and believed strongly were in the marketplace." R.101 at 14; R.85, Lee Dep. at 44–45.

Mobley and Hoffmann later discussed with each other the BMA offer. They also attested that they compared the offer with the competitive pricing that CertainTeed was offering distribution accounts at that time, although they did not check company pricing records because they were both familiar with that aspect of CertainTeed's business. Mobley stated that during negotiations they had asked Lee for written confirmation of the discount that BMA was receiving from Owens–Corning, but never followed up on this request because they received the information orally from Lee. CertainTeed accepted BMA's proposal, with minor exceptions, and, in August 1979, began to sell insulation to it at a 16 percent discount. After the initial sale, CertainTeed regularly reconfirmed that its pricing to BMA was competitive with other sellers.

We believe that CertainTeed, like Owens–Corning, has shown "the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor." *Falls City*, 460 U.S. at 438, 103 S.Ct. at 1290. Consequently, it is entitled to the "good faith/meeting competition" defense of section 2(b). We note, first, that the 16 percent discount that CertainTeed gave BMA was indisputably available in the market in August 1979. Indeed, BMA itself was receiving an equivalent discount from CertainTeed's competitor, Owens–Corning, at the time CertainTeed made its first sale. During the course of its negotiations with BMA, CertainTeed was assured by Lee that its price would not be below that which was available. This information was conveyed either explicitly, through a direct statement of Owens–Corning's price, or more obliquely, through Lee's representation that he would not allow CertainTeed to sell at a price that was "overly competitive." It is also undisputed that BMA was a major purchaser of building materials and was well-known in the insulation industry. Also, Alex McCaskill and George Hoffmann had known Lee prior to 1979, and they, along with Mobley, attested that BMA was a reputable and well-run operation. Therefore, as the district court found, BMA was not the type of customer whose representations would normally create suspicion. *See Reserve Supply Corp.*, 639 F.Supp. at 1467. Finally, Mobley and Hoffmann stated that, after Lee had made BMA's offer for a 16 percent discount, they evaluated the reasonableness of that offer against market conditions. As CertainTeed's Marketing Manager for Residential Insulation, Mobley was required to remain informed of the pricing of CertainTeed's competitors and to evaluate the credibility of reports of discounts from customers.

Despite this showing, Reserve contends that summary judgment in favor of CertainTeed is inappropriate for several reasons. First, Reserve asserts that a question exists whether Lee informed CertainTeed that BMA was actually receiving a 16 percent discount in August 1979. It claims that the record does not show clearly that the terms of any discount to BMA were revealed to CertainTeed, and that Lee's promise that any CertainTeed price would not be "overly competitive" may have referred to prices present in the market, but not actually available to BMA. Consequently, Reserve argues that it is not settled whether CertainTeed actually believed that it was meeting the price of a competitor when it extended its discount to BMA. Reserve's characterization of Lee's statement is strained and conjectural. The clear import of Lee's statement is that it refers to prices that BMA was already receiving on insulation or had available to it.

Reserve next contends that CertainTeed is not entitled to summary judgment because it cannot establish adequately that it

was ever threatened with a loss of business if it did not grant BMA a 16 percent discount. *See United States Gypsum*, 438 U.S. at 455, 98 S.Ct. at 2882. However, it is undisputed that, at the time of the negotiations between BMA and CertainTeed, CertainTeed was selling no insulation to BMA. Therefore, it would not have received any business if it did not meet BMA's offer. *See Falls City*, 460 U.S. at 446–47, 103 S.Ct. at 1294 (Section 2(b) defense "does not distinguish between one who meets a competitor's lower price to retain an old customer and one who meets a competitor's lower price in an attempt to gain new customers."). Finally, Reserve contends that CertainTeed inadequately examined whether the 16 percent discount was warranted by market conditions because it did not seek written verification from BMA of the discounts that it was receiving. Again, we note that independent verification of a customer's representations of the competition's offer has not been required uniformly. *See, e.g., Great Atlantic and Pacific Tea Co.*, 440 U.S. at 83–85, 99 S.Ct. at 934–35; *Jones v. Borden Co.*, 430 F.2d at 572–74; *Cadigan v. Texaco, Inc.*, 492 F.2d 383 (9th Cir.1974). Mobley and Hoffmann testified that they were familiar with the conditions in the insulation market, and that they evaluated the 16 percent discount against the market. Under the factors identified in *United States Gypsum*, this action was adequate to establish their good faith. *United States Gypsum*, 438 U.S. at 455, 98 S.Ct. at 2882 ("Efforts to corroborate the reported discount by seeking documentary evidence or by appraising its reasonableness in terms of available market data would also be probative [of good faith] ....").

## III

### THE SHERMAN ACT CLAIM

Reserve also claims that the court erred in granting summary judgment on its claim that Owens–Corning and CertainTeed agreed to fix prices in violation of section 1 of the Sherman Act, 15 U.S.C. § 1, and the Illinois Consumer Fraud and Deceptive Business Practices Act, Ill.Rev.Stat. ch. 121½, para. 261, *et seq.*[8]

### 1. Holding of the district court

In adjudicating the merits of the price-fixing claims, the district court first determined that Reserve had no direct evidence that Owens–Corning and CertainTeed had colluded to set prices in the insulation market. It then analyzed the circumstantial evidence of collusion that Reserve offered, including the facts that the defendants priced their product in a parallel manner, that they engaged in price discrimination, and that they raised prices when faced with a decrease in demand. The court determined that this evidence was as consistent with behavior in an oligopolistic, but competitive, market as it was with a market influenced by collusion. Concluding that Reserve's evidence did not tend to exclude the possibility that the defendants' conduct was as consistent with competition as it was with illegal conduct, the court granted summary judgment to Owens–Corning and CertainTeed on the Sherman Act count. *Reserve Supply Corp.*, 1992–1 Trade Cas. (CCH) ¶ 69,304 at 65,138–39, 799 F.Supp. 840 (citing *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)). Because the pendent state claim was premised on the existence of an agreement to fix prices, the court granted summary judgment on that count as well.

### 2. Guiding principles

■ "On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an agreement." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 763, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). To prevail " 'there must be evidence that tends to

---

**8.** The parties and the district court apparently assumed that the Illinois state law claim would stand or fall on whether there was an agreement to restrain trade in violation of the Sher-

man Act. Therefore, for the purposes of this appeal, we shall assume, without deciding, that this is a correct characterization of Illinois law.

exclude the possibility of independent action by the [defendants]. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Market Force, Inc. v. Wauwatosa Realty Co.,* 906 F.2d 1167, 1170–71 (7th Cir.1990) (quoting *Monsanto,* 465 U.S. at 768, 104 S.Ct. at 1473). In *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), the Court elaborated upon this standard and stated that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Instead, there must be evidence " 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Id.* (quoting *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471); *see also Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 726 (7th Cir.1986) ("[T]he plaintiff must demonstrate that the firm is behaving in a way that is inconsistent with unilateral decisionmaking.... This means showing that the defendant acted in a way that, but for a hypothesis of joint action, would not be in its own interest."); *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 660 (7th Cir.) (same), *cert. denied,* 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987).

▮ This case is before us after the district court granted summary judgment against Reserve on its price fixing claim. In order to contest successfully a motion for summary judgment, a nonmoving plaintiff " 'must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action.' " *Valley Liquors,* 822 F.2d at 660 (quoting *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356). In other words, the plaintiff must provide "evidence tending to exclude the possibility that [the defendants] acted independently, or that would show that the inference of conspiracy to fix prices is reasonable in light of the competing inference of independent action." *Id.* at 660–61. In *Market Force* this court articulated an an-

alytical scheme to be applied when ruling on motions for summary judgment on price fixing claims. *Market Force,* 906 F.2d at 1171. The court should inquire:

(1) is the plaintiff's evidence of conspiracy ambiguous, *i.e.,* is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Id.* (quoting *Gibson v. Greater Park City Co.,* 818 F.2d 722, 724 (10th Cir.1987)). In making this inquiry, the court should first examine the plaintiff's evidence of a conspiracy among the defendants. Next it should examine whether the defendants have offered evidence tending to show that the conduct complained of is as compatible with the defendants' legitimate business activities as with illegal conspiracy. If the court concludes that the foregoing analysis leaves the evidence of conspiracy ambiguous, it should then determine whether plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests. *Id.* at 1171–72.

3. Analysis

In evaluating Reserve's price fixing claim, it is helpful to restate a few facts about the fiberglass insulation industry contained in the record. First, this industry is highly concentrated. Between 1979 to 1983, Owens–Corning, CertainTeed, and Johns–Manville controlled approximately 85 to 90 percent of the market. The insulation that these vendors sell is essentially identical; it is manufactured in standard sizes and grades. Demand for insulation is tied to factors such as the level of housing starts. Consequently, demand is somewhat inelastic; a decrease in the price of insulation will not necessarily lead to a comparable increase in consumption.

Owens–Corning, CertainTeed, and Johns–Manville priced insulation according to an identical formula. Each manufacturer made available to its sales force a price list which gave a base price for different

grades, sizes, and facing of insulation. Apparently, however, no purchaser of insulation ever paid list price for the product. Instead, customers received a standard percentage discount off this price, depending upon the classification into which they fit. In addition, certain customers received additional discounts in order to counter competition from other manufacturers.

#### a.

■ Reserve has produced no direct evidence of a price fixing agreement.[9] Instead, it points to a number of circumstantial facts that it argues support an inference that there was a conspiracy to restrain trade in the fiberglass insulation market. Reserve alleges that, during the period relevant to this lawsuit, the fiberglass insulation industry was interdependent. One firm could not maintain higher prices than another without facing a loss in sales.[10] Owens–Corning and CertainTeed essentially concede this point by stating that they could not effectively cut price to increase market share because their rivals would follow suit. While Reserve concedes that this interdependence is not sufficient to prove the existence of an agreement to fix prices, it argues that such an agreement plausibly could exist in this type of industry. It is well-established, however, that "[t]he mere existence of an oligopolistic market structure in which a small group of manufacturers engage in consciously parallel pricing of an identical product does not violate the antitrust laws." *E.I. Du Pont de Nemours & Co. v. FTC,* 729 F.2d 128, 139 (2d Cir.1984); *see also Market*

*Force,* 906 F.2d at 1172 ("conscious parallelism by itself is not enough to support an antitrust conspiracy case"); *Weit v. Continental Illinois Nat'l Bank & Trust Co.,* 641 F.2d 457, 463 (7th Cir.1981) ("Courts have noted that parallel pricing or conduct lacks probative significance when the product in question is standardized or fungible."), *cert. denied,* 455 U.S. 988, 102 S.Ct. 1610, 71 L.Ed.2d 847 (1982). As our colleagues on the First Circuit have observed:

> Courts have noted that the Sherman Act prohibits *agreements,* and they have almost uniformly held, at least in the pricing area, that ... individual pricing decisions (even when each firm rests its own decision upon its belief that competitors will do the same) do *not* constitute an unlawful agreement under section 1 of the Sherman Act.... That is not because such pricing is desirable (it is not), but because it is close to impossible to devise a judicially enforceable remedy for "interdependent" pricing. How does one order a firm to set its prices *without regard* to the likely reactions of its competitors?

*Clamp–All Corp. v. Cast Iron Soil Pipe Inst.,* 851 F.2d 478, 484 (1st Cir.1988) (citations omitted) (emphasis in original), *cert. denied,* 488 U.S. 1007, 109 S.Ct. 789, 102 L.Ed.2d 780 (1989); *see also Theatre Enter., Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954) ("[T]his Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense.").

---

**9.** In a footnote in its brief, Reserve suggests that a 1981 discussion at a trade association meeting between a Johns–Manville employee and a counterpart from Owens–Corning shows the existence of a price-fixing agreement. Appellant's Br. at 43 n. 7. During this conversation a Mr. Walters of Johns–Manville remarked to a Mr. Zinn of Owens–Corning that Johns–Manville foresaw "moderate growth ahead" in the market, and that "they anticipate very little increase" in industry capacity. R.168, Zinn Dep. at 11–15. Mr. Zinn testified that he did not respond with any information about Owens–Corning's situation or plans. *Id.* We agree with the district court that this single, isolated, and vague statement is insufficient to infer an agree-

ment to fix prices. *Reserve Supply Corp.,* 1992–1 Trade Cas. (CCH) ¶ 69,304 at 65,137, 799 F.Supp. 840.

**10.** *See* 6 Phillip E. Areeda, *Antitrust Law* ¶ 1411 (1986) ("One firm's actions are interdependent with those of another when their utility depends on the other firm's response. If firm *A* has any influence on market price, it knows that its price change will affect rivals and that its gain from changing price depends upon rival reactions."); Richard A. Posner, *Antitrust Law: An Economic Perspective* 43 (1976) (Firms are "interdependent in their pricing" when "they base their pricing decisions in part on anticipated reactions to them.").

Therefore, the fact that Owens–Corning and CertainTeed engaged in parallel pricing of insulation cannot, by itself, support an inference that the two companies conspired to fix prices. *See Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1201 (7th Cir.1981) ("Parallel behavior without more (a 'plus factor') is not enough to establish a Sherman Act violation."), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Market Force*, 906 F.2d at 1172 n. 8 (collecting cases). As Professor Areeda has written:

> Interdependence is consistent with the existence of a conspiracy but does not itself prove the traditional agreement. It is a *necessary* condition for inferring any conspiracy from parallelism but is not *sufficient* to infer a traditional conspiracy. Motivation to enter a conspiracy is never enough to establish a traditional conspiracy.... Ordinarily, ... additional proof of conspiratorial activity is required.

6 Phillip E. Areeda, *Antitrust Law* ¶ 1411 (1986) (emphasis in original).

b.

■ Reserve next identifies actions by Owens–Corning and CertainTeed that it claims were contrary to economic self-interest, absent an agreement to fix prices. First, Reserve alleges that Owens–Corning and CertainTeed engaged in long-term economic price discrimination.[11] It then argues that this fact suggests that the price charged generally was inordinately high and would have been reduced if the market had been competitive. *See Falls City*, 460 U.S. at 443, 103 S.Ct. at 1293 ("Persistent, industrywide price discrimination within a geographic market should certainly alert a court to a substantial possibility of collusion."). In response, Owens–Corning and CertainTeed argue that Reserve only asserts that economic price discrimination oc-

curred, but that it has not brought forward sufficient financial data to show that such discrimination actually occurred or that it was so pervasive as to suggest price fixing. In a related contention, Reserve argues that Owens–Corning and CertainTeed made supracompetitive profits during the time covered by this suit. The defendants again counter by claiming that Reserve has done nothing more than assert that profits were extraordinary, and has not proven that they were beyond those afforded by a competitive market.

■ As Reserve correctly notes, "[p]ersistent economic discrimination" might be relevant to whether price fixing exists. Appellant's Br. at 34; *see Falls City*, 460 U.S. at 443 n. 10, 103 S.Ct. at 1293 n. 10; *Coal Exporters Ass'n of the United States, Inc. v. United States*, 745 F.2d 76, 91 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985). However, after a thorough and independent examination of the record, we agree with the district court that Reserve's contentions that Owens–Corning and CertainTeed engaged in long-term economic price discrimination is so underdeveloped that it cannot produce a genuine issue of triable fact. Reserve asserts only that Owens–Corning and CertainTeed made greater profits on sales to distributors than to contractors, and that they provided additional discounts to BMA that were not available to Reserve. As the district court noted, even if economic price discrimination did occur, Reserve has made no showing that it was so persistent or widespread as to support a conclusion that collusive pricing existed. *Reserve Supply Corp.*, 1992–1 Trade Cas. (CCH) ¶ 69,304 at 65,138, 799 F.Supp. 840. Indeed, temporary or sporadic discrimination can occur within a competitive market. Moreover, as we have already seen in our discussion of the Robin-

---

**11.** " 'Economic' price discrimination consists in selling a product to different customers at prices that bear different ratios to the marginal costs of sales to those customers, for example, charging the same price to two customers despite the fact that the seller incurs higher costs to serve one than the other, or charging different prices to two customers despite the fact that

the seller's costs of service are the same." *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 443 n. 10, 103 S.Ct. 1282, 1293 n. 10, 75 L.Ed.2d 174 (1983); *see also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1406 (7th Cir.1989), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990).

son–Patman claim, the price discrimination with respect to BMA was due to a good faith effort to meet a competitor's price.

■ Reserve's argument that Owens–Corning and CertainTeed gained supracompetitive profits suffers from similar defects. Reserve asserts that Owens–Corning and CertainTeed made "high profits," and it attempts to establish that these profits were supracompetitive by pointing out, first, that Owens–Corning and CertainTeed made higher profits on fiberglass insulation than they did on other products, and, second, that they met the lower prices offered by small regional competitors when those competitors entered the fiberglass insulation market. Reserve offers no evidence, such as studies on the comparative costs of production or on market conditions, to indicate that these profits were above those available in a competitive market. Likewise, the fact that Owens–Corning and CertainTeed dropped prices to meet the challenge of pricecutting regional competitors does not necessarily indicate that the profits they reaped were above those available in a competitive market. Reserve also contends that these price drops "protected profits in those markets uneffected [sic] by the competition caused by new entry." Appellant's Br. at 38. Apparently, Reserve is arguing that Owens–Corning and CertainTeed dropped their prices in these regions as part of an agreement to isolate competition and prevent its spread. However, as Reserve admits, because of the interdependence of the market, one producer cannot maintain higher prices than another without risking a loss of market share. *Id.* at 32. Meeting the discounts of new regional competitors does not suggest necessarily a conspiracy to maintain higher prices in other regions. These actions well could have been independent decisions of Owens–Corning and CertainTeed to cut prices in order to preserve market share. *See Clamp-All Corp.*, 851 F.2d at 484.

### c.

■ Reserve also claims that Owens–Corning and CertainTeed's parallel price increases during the late 1970s and early 1980s indicate that a price fixing agreement was in place. From late 1979 to 1982, the housing market and, consequently, the demand for fiberglass insulation were depressed. However, during that period, Owens–Corning and CertainTeed announced a series of parallel price increases in insulation products. Reserve asserts that during this slow period Owens–Corning and CertainTeed followed a strategy of raising prices and decreasing capacity, which made no economic sense without an agreement to raise prices. Instead, contends Reserve, a competitive producer should have maintained lower prices in an attempt to increase sales and revenues. In response, Owens–Corning and CertainTeed first assert that a portion of their price increases were attributable to increased costs. They also assert that the nature of their industry made it irrational to attempt to increase sales by maintaining lower prices, because a lower price would be met by their competitors, leaving no increase in market share and reduced profit levels. Certain-Teed also argues that no evidence exists in the record to show that it reduced production capacity during the economic slowdown.

Reserve's evidence that Owens–Corning and·CertainTeed increased prices during a period of low demand in the early 1980s does not unambiguously suggest, given the prevailing market conditions, an agreement to fix prices. Those companies have brought forward evidence that they experienced increased costs during this period. Indeed, Reserve admits that some of these price increases may be attributable to cost increases. Appellant's Reply Br. at 19 n. 6. Also, we are unpersuaded by Reserve's argument that the economically rational action for Owens–Corning and CertainTeed during a time of reduced demand necessarily would have been to cut price in order to increase sales. Because the market for insulation was inelastic, a drop in price would not have led to an appreciable increase in industry-wide demand. Therefore, the only new customers which would have been available were those that were currently being served by their competitors.

A firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all. One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry.

*Clamp–All Corp.*, 851 F.2d at 484. The logical outcome of the price-cutting that Reserve advocates would be static market shares for the producers and reduced profit margins.[12] The fact that Owens–Corning and CertainTeed decided to forego this option does not suggest that they "acted in a way that, but for a hypothesis of joint action, would not be in [their] own interest." *Illinois Corporate Travel*, 806 F.2d at 726.

### d.

As additional evidence of collusion, Reserve points to Owens–Corning and CertainTeed's practices of maintaining price lists for products and of announcing price increases thirty to sixty days before their effective date. Reserve asserts that these lists have no independent value because no buyer in the industry pays list price for insulation. Instead, it claims that the price lists are an easy means for producers to communicate and monitor the price activity of rivals by providing a common starting point for the application of percentage discounts. As a result, "each manufacturer can easily monitor the net prices of its rivals and thereby reduce pricing uncertainty." Appellant's Br. at 45. Reserve also contends that, because Owens–Corning generally announced price increases sixty days in advance, while CertainTeed and Johns–Manville announced around thirty days in advance, these announcements served as a way to negotiate price increas-es throughout the industry. Owens–Corning and CertainTeed counter by arguing that the use of list prices to monitor pricing would not be possible because the widespread use of discounts in the industry ensures that list prices do not reflect the actual price that a purchaser pays. They also contend that announcing price increases thirty to sixty days in advance serves a legitimate purpose because their customers, who are mostly rehandlers and contractors, need to be able to inform their customers of price increases or to figure such increases into their bidding.

■ We agree that the industry practice of maintaining price lists and announcing price increases in advance does not necessarily lead to an inference of price fixing. The fact that a standard product is priced according to a standard formula does not indicate that a conspiracy exists; one manufacturer could have implemented the pricing system, and its competitors could have decided independently to adopt it. The result would have been permissible "conscious parallelism," rather than illegal collusion. *See Market Force*, 906 F.2d at 1172; *United States v. Phelps Dodge Indus., Inc.*, 589 F.Supp. 1340, 1349 (S.D.N.Y. 1984) ("The issuance of identical price lists in [a] highly oligopolistic ... industry is not alone sufficient to establish collusive behavior. 'Rigid list prices do not prove collusion if transaction prices depart substantially from list.' ") (quoting Posner, *Oligopoly and the Antitrust Laws: A Suggested Approach,* 21 Stan.L.Rev. 1562, 1581–82 (1969)); *United States v. FMC Corp.*, 306 F.Supp. 1106, 1117 (E.D.Pa.1969); *see also* 6 Phillip E. Areeda, *Antitrust Law* ¶ 1425d4 (1986). Second, this pricing system would be, to put it mildly, an awkward facilitator of price collusion because the industry practice of providing discounts to

---

**12.** As the Eastern District of Pennsylvania noted in *United States v. FMC Corp.*, 306 F.Supp. 1106, 1139 (E.D.Pa.1969), when discussing the market for homogeneous chlor-alkali products:

[D]ue to the relative inelasticity of demand for the products a lower price will not increase the size of the total market; no produc-er can successfully sell at a higher price than its competitors; and if a seller attempts to sell at a lower price ... its competitors will be given the opportunity to meet its lower price, thereby resulting in uniform prices again, but at a lower level; and without any increase in the original seller's net share of the market.

individual customers ensured that list price did not reflect the actual transaction price.

■ We also believe that the fact that Owens–Corning and CertainTeed informed their customers of price increases in advance hardly enhances Reserve's case. These advanced announcements did reduce the uncertainty inherent in raising prices by allowing competitors time to decide if they would follow suit. In that way they facilitated the parallel pricing that occurred in the market. *See* 6 Phillip E. Areeda, *Antitrust Law* ¶ 1425d (1986). However, the record indicates that these announcements served an important purpose in the industry. Many of Owens–Corning's and CertainTeed's customers resold insulation to other customers or bid on building contracts well in advance of starting construction and, therefore, required sixty days' or more advance notice of price increases. Indeed, Reserve's president testified during his deposition that Reserve required manufacturers to provide at least thirty days' notice of price increases. R.145, Hamrick Dep. at 132–34, 338–39. Therefore, the practice of announcing price increases is explainable apart from any agreement to fix prices. *See Illinois Corporate Travel*, 806 F.2d at 726; *cf. In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 906 F.2d 432, 445–448 (9th Cir.1990) (advance announcements of price increases could support inference of price fixing when "appellees' officers' own testimony indicates that there was essentially no purpose for publicly announcing ... prices and dealer discount information other than to facilitate either interdependent or plainly collusive price coordination."), *cert. denied,* — U.S. ——, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991). The fact that Owens–Corning tended to announce its prices sixty days in advance, while CertainTeed and Johns–Manville provided thirty days' notice, does not lead to an inference of a conspiracy. Although Owens–Corning was generally the price leader, it was not invariably so. The record reflects that, during the period covered by this lawsuit, both CertainTeed and Johns–Manville announced price increases before Owens–Corning did. This fact suggests that these manufacturers had the ability to decide independently to initiate a price raise, which the other manufacturers could decide if they would follow. *See Market Force*, 906 F.2d at 1172 (announcement of realtors' commission policies, which competitors then had the opportunity to adopt "is nothing more than a restatement of conscious parallelism."). It also tends to rebut Reserve's suggestion that an agreement was in place that Owens–Corning would dictate price increases, which CertainTeed and Johns–Manville would then follow.

e.

■ Reserve points to the fact that several smaller, regional competitors have entered the fiberglass insulation field and suggests that they were attracted to the industry, which had an overcapacity, only by the lure of monopolistic profits prevailing because of the defendants' alleged collusion. The defendants reply by arguing that this hypothesis applies only if the industry has persistent excess capacity; otherwise, the entry could be seen as a bet by the new arrivals that demand would increase. They then claim that at the time of this suit any excess capacity in the industry was temporary, and not of a type sufficient to support Reserve's hypothesis. Reserve has made no showing of persistent overcapacity in the insulation market. Its argument is conclusory and, at best, it has demonstrated that new producers entered during a temporary slow market in the early 1980s. Without more, the entry of new competitors is consistent with a competitive market based on the participants' estimation of prospects for future growth.

4. Summary

"The teaching of *Monsanto* and *Matsushita* is that, in order to survive a summary judgment motion, a plaintiff must put forward evidence that tends to exclude the possibility of independent action. A defendant is entitled to summary judgment when it 'provides a plausible and justifiable alternative interpretation of its conduct that rebuts the alleged conspiracy.'" *Market*

*Force,* 906 F.2d at 1174 (quoting *City of Long Beach v. Standard Oil Co.,* 872 F.2d 1401, 1406 (9th Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1126, 107 L.Ed.2d 1032 (1990)). The circumstantial evidence of price fixing that Reserve has brought forward is as consistent with independent action in an interdependent market as it is with an agreement to fix prices. Because of the interdependence of the fiberglass insulation industry, consciously parallel pricing alone does not indicate a conspiracy. *E.I. Du Pont de Nemours & Co.,* 729 F.2d at 139. Reserve's other evidence of conspiratorial behavior is consistent with behavior in a market not affected by a price fixing agreement. Owens–Corning and CertainTeed have brought forward evidence that suggests that their decisions to raise price during a time of slack demand were consistent with their independent economic self-interest. Their price lists do not facilitate conspiratorial activity, and their advance announcements to customers of price increases appear to serve legitimate business purposes. The entrance of new competitors into the industry does not suggest a conspiracy absent an additional showing of persistent overcapacity, which Reserve has not made. Indeed, the existence of a number of small competitors in the market may undercut an inference of a price fixing conspiracy. Reserve's assertions that the industry engaged in widespread economic price discrimination and reaped supracompetitive profits are so underdeveloped as to be not probative. This evidence cannot satisfy Reserve's burden under *Market Force,* 906 F.2d at 1171, of bringing forward evidence that tends to exclude the possibility that Owens–Corning and CertainTeed were acting independently in the market. The district court properly granted summary judgment on the price fixing claims.

### Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.