**ELI LILLY AND COMPANY,**
**Plaintiff,**

v.

**ZENITH GOLDLINE PHARMACEUTI-**
**CALS, INC. (formerly Zenith Labo-**
**ratories, Inc.), Defendant.**

**No. IP 95–0536–C–B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Nov. 9, 2001.

Paul H. Berghoff, McDonnell, Boehnen, Hulbert & Berghoff, Chicago, IL, Stephen M. Nickelsburg, Hunton & Williams, Washington, DC, John R. Schaibley, III, Baker & Daniels, Indianapolis, IN, Thomas G. Slater, Jr., Hunton & Williams, Richmond, VA, Paul F. Ware, Jr., Goodwin Proctor & Hoar LLP, Boston, MA, for plaintiff.

Stephen E. Arthur, Harrison & Moberly, Indianapolis, IN, William L. Mentlik, Lerner David, Littenberg, Krumholz & Mentlik, Westfield, NJ, Keith E. Rounsaville, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Tampa, FL, Jay B. Shapiro, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, FL, for defendant.

1. Defendants American Cyanamid Co., Biocraft Laboratories, Inc. and Biochimica Opos, S.p.A. ("Opos") are no longer a part of this case.

2. Count II of the Amended Counterclaim alleges unfair competition under New Jersey common law. Lilly asks for summary judgment on this counterclaim. In its briefs, Zenith does not respond to Lilly's arguments concerning unfair competition. On this issue, Lilly is entitled to summary judgment.

3. A ruling on the summary judgment motions has been patiently awaited by the parties. The Court takes this opportunity to list the briefings submitted on these motions:

## ENTRY DENYING ZENITH'S MOTION FOR SUMMARY JUDGMENT AND DENYING IN PART AND GRANTING IN PART LILLY'S MOTION FOR SUMMARY JUDGMENT

BARKER, District Judge.

In 1995, Plaintiff Eli Lilly and Company ("Lilly") filed this action against Defendant Zenith Goldline Pharmaceuticals, Inc. ("Zenith"), formerly Zenith Laboratories, Inc., and three other American and Italian drug companies [1] alleging infringement of certain patents owned by Lilly for the making of cefaclor, an antibiotic. Later in 1995, Zenith filed a counterclaim alleging antitrust violations under federal law and unfair competition claims under New Jersey law. The counterclaim was amended on May 4, 2000. Earlier this year, this Court denied Lilly's Motion to Dismiss Zenith's Counterclaims. *Eli Lilly and Co. v. American Cyanamid Co.*, 2001 WL 30191, at *1 (S.D.Ind.2001). Before us now are Lilly's Motion for Summary Judgment on Zenith's Amended Counterclaim and Zenith's Motion for Summary Judgment on Liability as to Count I of the Amended Counterclaim. For the reasons set forth below, Lilly's motion is *DENIED* in part and *GRANTED* in part.[2] Zenith's motion is *DENIED*. In addition, Zenith's Motion to Strike Lilly's Response to Zenith's Supplemental Surreply is *DENIED as MOOT*.[3]

(1) Lilly's Memorandum in Support of Lilly's Motion for Summary Judgment;

(2) Zenith's Memorandum in Support of Zenith's Motion for Summary Judgment;

(3) Lilly's Memorandum in Opposition to Zenith's Motion for Summary Judgment;

(4) Zenith's Memorandum in Opposition to Lilly's Motion for Summary Judgment;

(5) Lilly's Reply in Support of Lilly's Motion for Summary Judgment;

(6) Zenith's Reply to Lilly's Memorandum in Opposition to Zenith's Motion for Summary Judgment;

(7) Lilly's Surreply Memorandum in Opposition to Zenith's Motion for Summary Judgment;

## Procedural History

This case has quite a history. Soon after it was filed in 1995, the Court denied Lilly's motion for preliminary injunction, in which we were asked to enjoin defendants from importing cefaclor manufactured by Opos, an Italian company, into the United States. *Eli Lilly and Co. v. American Cyanamid Co.*, 896 F.Supp. 851 (S.D.Ind. 1995). This decision was later affirmed by the Federal Circuit. *Eli Lilly and Co. v. American Cyanamid Co.*, 82 F.3d 1568 (Fed.Cir.1996). In 1999, we ruled that Opos's method for manufacturing "compound 6"[4] did not infringe Lilly's patents under the material change exception to the Process Patent Amendment Acts. *Eli Lilly and Co. v. American Cyanamid Co.*, 66 F.Supp.2d 924 (S.D.Ind.1999). In February 2001, the Court denied Zenith's motion for summary judgment on the grounds that Zenith's acts fell outside of the safe harbor from liability for importing infringing products. *Eli Lilly and Co. v. Zenith Laboratories, Inc.*, 134 F.Supp.2d 981 (S.D.Ind.2001).[5] Recently, the Court has ruled on a number of pretrial motions. In addition, at least eight pretrial motions remain pending. Here we address the very difficult and complex cross-motions for summary judgment.

## Factual Background

While the facts are examined more fully below, a brief description of the various participants in this case and a recap of the course of events at issue will be helpful. Beginning in the late 1980s and early 1990s, Lilly began preparing its strategy for dealing with the expiration of their patents on cefaclor, which they marketed under the name Ceclor. Cefaclor's patent (No. 3,925,372) expired in December 1992. The expiration date for the patent on the

(8) Zenith's Surreply to Lilly's Reply Memorandum in Support of Lilly's Motion for Summary Judgment;

(9) Zenith's Notice of Supplemental Authority Reversing Case Upon Which Lilly Relied for the Summary Judgment Motions;

(10) Lilly's Response to Zenith's Notice of Supplemental Authority;

(11) Zenith's Supplement to Zenith's Surreply in Opposition to Lilly's Motion for Summary Judgment;

(12) Lilly's Response to Zenith's Supplemental Surreply Memorandum;

(13) Zenith's Motion to Strike Lilly's Response to Zenith's Supplemental Surreply;

(14) Lilly's Motion in Opposition to Zenith's Motion to Strike Lilly's Response to Zenith's Supplemental Surreply;

(15) Zenith's Reply to Lilly's Response to Zenith's Supplemental Surreply (!), (filed May 18, 2001);

(16) Lilly's Response to Zenith's Filing of May 18, 2001; and last, and almost certainly least—

(17) Zenith's Reply to Lilly's Response of May 30, 2001.

Note that this list does not include the more than 15 appendices or the more than ten statements of material "facts" filed in conjunction with these motions. Perhaps the parties would have needed less patience if they had pared down the briefing on these motions. Filings 11–17 seemed to us to be especially superfluous. While we assure the parties that all the briefs were read and carefully considered, an attentive reading of this order will reveal that their latter filings are not cited, suggesting that they did not aid either party's cause. In candor, we have been left exhausted and nearly speechless by the parties' wholesale abuse of Local Rule 56.1.

4. The manufacture of the antibiotic cefaclor is a multi-step process, although the exact number of steps depends on the manufacturer and the process used. For our purposes, certain compounds are important. Bulk cefaclor is converted from the cefaclor nucleus (or "7ACCA" or "3 chloro 7–amino cephem ester" or "7–amino") into dosage form for medical use. The term "zwitterion nucleus" refers to the cefaclor nucleus made by another company discussed later. Exomethylene and enol are compounds used to make the cefaclor nucleus.

5. Zenith has asked us to reconsider this ruling or to certify it for interlocutory appeal. That motion is ruled on in an accompanying entry.

cefaclor nucleus (No. 4,064,343) was December 20, 1994. Various process patents were scheduled to expire on later dates. In addition, because of the strong profit potential of a generic version of this antibiotic, a number of other companies began preparing *their* strategies for the expiration of Lilly's patents. One such company was ACS Dobfar, S.p.A. ("Dobfar"), and Italian company, run by Marco Falciani, that was interested in making bulk cefaclor for dosage manufacturers. Other companies with similar interests were Opos, registered under the laws of Italy, and Ranbaxy Laboratories, Ltd. ("Ranbaxy"), an Indian company manufacturing pharmaceutical products, including the zwitterion nucleus, its version of the cefaclor nucleus. Zenith, a company then run by John Klein, wanted to make cefaclor dosages for the U.S. market. The various capabilities of some of these companies are at issue in the case and are discussed where relevant to determining whether there is a genuine issue of material fact. Suffice it to say for now that Zenith eventually acquired bulk cefaclor from Opos, and in May of 1995, Zenith began selling cefaclor dosages in the United States. The volume of its sales was high in 1995 and 1996. Zenith's cefaclor was later taken off the market due to the discovery of problems with the bulk cefaclor produced by Opos.

## Legal Analysis

### Summary Judgment Standard

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted if the designated evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The moving party may meet its burden of demonstrating the absence of a triable issue by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing a well-supported summary judgment motion may not simply rest on the pleadings, but must respond affirmatively with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, courts must construe all facts and draw all reasonable and justifiable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Shank v. William R. Hague, Inc.,* 192 F.3d 675, 681 (7th Cir.1999). Nonetheless, the "mere scintilla of evidence in support of the plaintiff's [or the defendant's] position will be insufficient" to avoid summary judgment. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505.

### Zenith's Antitrust Claim

Under § 1 of the Sherman Act, 15 U.S.C. § 1, "[e]very contract, combination ..., or conspiracy, in restraint of trade" is illegal. "Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' [the Supreme] Court has long recognized that Congress intended to outlaw only unreasonable restraints." *State Oil Co. v. Khan,* 522 U.S. 3, 7, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Under Seventh Circuit precedent, to succeed on a claim under Section 1 of the Sherman Act, Zenith must prove three elements: "(1) a contract, combination or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury." *Denny's Marina, Inc. v. Renfro Productions, Inc.,* 8 F.3d 1217, 1220 (7th Cir.1993). The parties hotly contest whether Zenith can meet this burden with regard to all three elements. We begin be examining the first element.

## Conspiracy in Restraint of Trade

Zenith alleges that Lilly entered into illegal horizontal agreements with Dobfar and Ranbaxy to restrict the supply of bulk cefaclor for the U.S. market. To prevail, "there must be direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 48–49 (7th Cir.1992) (citations omitted). Zenith points to a number of contracts and communications between Lilly and its business partners and to intra-Lilly communications in its attempt to show direct evidence of illegal conspiracy. We examine these below, remembering that the party against whom summary judgment is being considered is entitled to all reasonable inferences in its favor. *Liberty Lobby, Inc.*, 477 U.S. at 255, 106 S.Ct. 2505.

We look first at Zenith's most promising offer of unambiguous evidence. On June 27, 1990, Lilly and Dobfar entered into a contract in which Dobfar agreed to produce the cefaclor intermediate, 7–amino, for Lilly. This outsourcing agreement was later amended by the Manufacturing and Supply Agreement ("MSA") attached as Exhibit 200 to Zenith's Motion. Section 10.1 of this document stated as follows:

*Use of LILLY Technology*

ACS–DOBFAR shall use LILLY PATENTS and LILLY KNOW HOW ... the EXOMETHYLENE and ENOL supplied by LILLY or ELSA and assets purchased or provided by LILLY/ELSA only to produce material to be supplied to LILLY or ELSA. ACS DOBFAR will supply cefaclor, LILLY PRODUCT, and any of its intermediates of cefaclor exclusively to LILLY/ELSA. In recognition of the difficulty of establishing whether any LILLY KNOW–HOW has been used, *ACS–DOBFAR shall not supply cefaclor or any of its intermediates to any third party.*

Zenith Ex. 200 (emphasis added). The contractual language in this M.S.A. § flatly prohibits the sale of cefaclor and ceflaclor intermediates, no matter what the source or production method, by Dobfar to any company other than Lilly. As such, it constitutes direct evidence of an agreement illegally restraining trade.

However, this seemingly clear evidence does not carry the day for Zenith. The parties argue at length about when the contract went into effect,[6] even though the document itself states that "[t]he terms of this Agreement shall be five (5) years beginning on May 1, 1991." Zenith Ex. 200, § 12.1. As to the end date, for summary judgment purposes, it appears that the agreement was amended either "[b]y September 1991" (Lilly's position) or "on September 4, 1991" (Zenith's position) ·by another M.S.A. § with less restrictive language as we will discuss below. Under either timeline, the version of § 10.1 completely prohibiting sales to third parties by Zenith was in effect for little more than four months. For the remainder of

---

**6.** Zenith maintains that the effective date of the amendment is reflected in a notation on its first page, saying "6/27/90—Revised 4/16/91." Zenith's Resp. to Lilly's Stm. of Additional Facts, ¶217. Lilly cites the deposition testimony of Thomas Pytynia, then General Counsel for Lilly International Corporation, as support for the position that the beginning date of the revised M.S.A. § was sometime after May of 1991. Lilly's Stm. of Additional Facts, ¶217 (citing Pytynia Dep. at 17). In its surreply, Lilly states that "the record appears to indicate that it was not executed until June," but cites no particular part of the record for this proposition. Neither party adequately explains why the start date for the contract set forth in the terms of the contract itself should not be accepted as the definitive answer on the subject.

the period alleged in the antitrust claim, Zenith must offer other direct or circumstantial evidence of an agreement restraining trade.

■ In an effort to shoulder this burden, Zenith points to the September 1991 amendment of the M.S.A. § discussed above. In this version, § 10.1 changed dramatically. It reads in relevant part:

> In recognition of the difficulty of establishing whether any LILLY KNOW–HOW has been used, ACS–DOBFAR shall not supply cefaclor or any of its intermediates to any third PERSON unless ACS DOBFAR can demonstrate to LILLY's satisfaction that any cefaclor or intermediate to be supplied: (1) was made in accordance with a manufacturing process provided by a third PERSON for the manufacture of the product to be supplied and was not made with LILLY KNOW–HOW or pursuant to information, techniques, or processes developed from LILLY KNOW–HOW; (2) was not made from EXOMETHYLENE or ENOL supplied by LILLY or ELSA; (3) does not violate LILLY PATENTS and is not made in violation of LILLY PATENTS; (4) is not made by using any assets owned or financed by LILLY or ELSA; and (5) will not by virtue of such sale or the purchase of materials needed for its manufacture disclose, or enable anyone to determine, any aspect of the LILLY KNOW–HOW.
>
> In addition, ACS–DOBFAR's supply of such material to any third PERSON shall not impede or put at risk ACS–DOBFAR's ability to perform its obligations under this Agreement. ACS–DOBFAR shall agree to retain the right in all of its agreements with third PERSONS to terminate such third PERSON agreement if LILLY/ELSA propose to increase orders from ACS–DOBFAR of LILLY PRODUCT and if ACS–DOBFAR could meet the LILLY/ELSA demand but for such third PERSON agreements. LILLY/ELSA will not withhold unreasonably consent for such supply.

Zenith Exhibit 207, § 10.1.

■ Zenith makes four arguments that this provision is an illegal restraint on trade, but all we conclude are ultimately unavailing. First, Zenith contends that the burden of "demonstrat[ing] to Lilly's satisfaction" is a grant of absolute veto power over Zenith's sales to third parties. Zenith's Reply at 7. Going from "satisfaction" to "absolute veto power" is a leap Zenith cannot reasonably make or ask us to take. In fact, in reference to supply to third parties, the contract specifically states that "LILLY/ELSA will not withhold unreasonably consent for such supply." Zenith Ex. 207, § 10.1. Second, Zenith objects to the first of the enumerated tests because it prohibited Dobfar from using the two processes it had owned or had access to that did not use Lilly's technology to make cefaclor on the ground that the processes "were not 'provided by the third party for manufacture of the product to be supplied.'" *Id.* at 8 (misquoting Zenith Ex. 207). The contract does not require that the third party purchaser be the same third party that provides the process, as Zenith creatively interprets the language. Instead, it requires only that the process not originate from Lilly. Hence, use of the Shionogi process, with which Zenith was working, could be used by Dobfar to produce cefaclor intermediates for another customer.

■ Third, Zenith argues that the third test requiring that the production of cefaclor or its intermediates "does not violate LILLY PATENTS and is not made in violation of LILLY PATENTS" is an impermissible restraint. Zenith Reply at 8. Zenith points out that Lilly's U.S. patent on the cefaclor nucleus remained in effect

until December 20, 1994 so that all routes of cefaclor synthesis had to pass through a Lilly patent until that time. Zenith continues that this restraint therefore violates 35 U.S.C. § 271(e)(1) which permits importation of patented inventions for FDA registration purposes even if Dobfar had a non-Lilly process with which to make cefaclor. This argument assumes that Lilly's contract trumps the statutory meaning of what it means to violate a patent. The contract only prohibits the sale of products made in violation of Lilly patents, which importation for registration purposes cannot do, since the statute Zenith cites explicitly states that importation for FDA registration purposes is "not ... an act of infringement." 35 U.S.C. § 271(e)(1). Zenith's argument gets caught in the circularity of this exception to the definition of patent infringement. The Court will not find an antitrust violation through remote implication. Fourth and finally, Zenith states that the test prohibiting the use of "assets owned or financed by Lilly or ELSA" is illegal because Lilly financed Dobfar's equipment rather than requiring Dobfar to obtain commercial financing. Zenith Reply at 9. Having provided the financing to Dobfar, Lilly chose to protect its investment. Zenith points to no antitrust law prohibiting this means of protecting one's investment. This contract simply is not the direct evidence of conspiracy that Zenith wants it to be.

■ Likewise, Zenith's other offers of direct evidence do not suffice. They primarily consist of statements in internal documents concerning relationships between Lilly with Dobfar and Ranbaxy. The Court concludes that Zenith's interpretations of the selected excerpts from

the documents cannot be embraced by a reasonable jury. For instance, Zenith first produces an email sent from Joseph M. Hunt, who worked in purchasing at Lilly, to a number of Lilly employees including Dr. Fred Perry and Joseph Cook, a vice president, on January 4, 1991. Zenith Ex. 30. Zenith cites the following excerpt from the four-page email as direct evidence of conspiracy:

> Role of InterChem[7] and Ron Manino in future business. We agreed that Inter-Chem's responsibilities would be only for regular products sold in the U.S., such as cefazolin and cefuroxime. He will handle none of the cefaclor transactions and none of the transactions outside the U.S.

*Id.* at 3. Zenith reads these statements apart from their context and concludes that they memorialize a horizontal agreement, made in December of 1990, between Lilly and Dobfar, restricting Dobfar from selling bulk cefaclor in the United States to generic dosage manufacturers, such as Zenith, for FDA registration purposes. Zenith Memo. at 8–11.[8]

However, this method of interpretation is contrary to both legal precedent and common sense. *Copous v. Texaco, Inc.,* 1994 WL 670443, at * 3 (E.D.La.1994) (finding "plaintiff's unsupported and self-serving characterization of [documentary evidence] ... insufficient to create a material fact issue."); *Dorsch v. L.B. Foster Co.,* 782 F.2d 1421, 1426 (7th Cir.1986) (cautioning parties opposing summary judgment against engaging in "meaningless semantic squabbles" and "misstat[ing] the record"). The sentences quoted above are lifted from a four-page email summarizing the events of a trip to Europe to

---

**7.** InterChem Corporation ("InterChem"), of Paramus, New Jersey, is Dobfar's agent for the sale of pharmaceutical products in the United States. Ronald S. Manino is the chairman of InterChem.

**8.** The Court notes the near-absurdity of needing more than three pages of briefing, not including reply briefing, to explain how this writing is "direct" evidence of a horizontal conspiracy.

assess suppliers of products for purchase by Lilly. No other excerpt from the email even arguably mentions Dobfar's relationship with customers other than Lilly. Instead, certain details in the supply relationship between Dobfar and Lilly are covered in some detail. *See, e.g.,* Ex. 30 at 3 ("He [Falciani of Dobfar] admits that he has been chronically late on cefuroxime shipments."). Cefaclor is included among the products for which there were supply issues. *Id.* ("We have made arrangements to ship one lot of the cefaclor nucleus to Clinton [Indiana] in this package at trial.").

In an effort to counter the straightforward understanding of the email (that it covers supply issues between Lilly and Dobfar, specifically whether InterChem will serve as the intermediary for the cefaclor transactions between Lilly and Dobfar), Zenith argues that, in December of 1990, Lilly had no cefaclor purchase arrangements with Dobfar. Hence, according to Zenith, the agreement that "InterChem would handle 'none of the cefaclor transactions' applied only to actual and potential customers of Dobfar bulk cefaclor in the Untied States other than Lilly, [like Zenith]," because there were no Lilly–Dobfar cefaclor transactions to handle. Zenith's Memo. at 10. It is undisputed, however, that on June 27, 1990, Lilly and Dobfar had entered into an agreement in which Dobfar produced a cefaclor intermediate, the cefaclor nucleus, for Lilly, using compounds provided by Lilly.[9] There is

no allegation that this agreement was no longer in effect in some form when Hunt spoke with Falciani in December of 1990. Instead, Zenith makes a bizarre two-fold argument. First, Zenith argues that the June 27, 1990 agreement was a "toll manufacturing" agreement which is not the same thing as a "transaction," as referenced in the email, because Lilly retained title to the intermediates under the toll manufacturing arrangement. Zenith Reply at 19–20. The precise legal meaning of "transaction" might exclude toll manufacturing agreements, but the dictionary definition is considerably broader, meaning "to conduct business," which certainly encompasses this relationship between Lilly and Dobfar. The American Heritage Dictionary (3d ed.1992). We note that the email is not a precisely-composed legal document and conclude that Zenith's interpretation on this basis is unreasonable. Second, Zenith argues that "cefaclor transactions" excludes from its purview transactions involving seven amino (or "cefaclor nucleus") rather than the finished product cefaclor, a parsing that similarly defies ordinary use of language. In sum, Zenith's interpretation of three sentences extracted from a four-page email as direct evidence of an illegal horizontal agreement simply is not an inference reasonably permitted by context.[10]

■ Zenith's next proffer of purported direct evidence is a series of emails, dating from late June to early July of 1994, circulating among a number of high-level Lilly

---

9. This type of arrangement, where one party owns the input and the output of a manufacturing process undertaken by another party, is referred to as "toll manufacturing."

10. In support of the interpretation that follows from reading the excerpt in its context, Lilly submitted the affidavit of Joe Hunt. In that affidavit, Hunt explains that "[d]uring my December 1990 visit, I clarified that Lilly would purchase cefaclor nucleus directly

from ACS Dobfar, and not through InterChem . . . . and memorialized this agreement in an e mail message." Hunt Aff., ¶¶ 4–5. Zenith objects to the use of the affidavit to clarify either the email or Mr. Hunt's deposition testimony. Zenith Reply at 19–20. Zenith's objection is unavailing. As we determined above, Zenith's reading of the email is an impermissible and unreasonable inference based on the document itself. Mr. Hunt's affidavit is not a necessary clarification.

employees. On June 30, 1994, Patrick Fourteau, Lilly's Vice President of European Operations, sent an email to Sidney Taurel, then Lilly's Executive Vice President, and copied to John Voris, Executive Director of Oral Anti–Infective Business Unit. Under the subject line, "cefaclor sold by ACS to Teva and Novopharm," Fourteau reported:

> Talked to Marco Falciani who confirmed that he has provided the 2 above mentionned (sic) companies with material for regn [registration] in the US. His move is part of what he feels has been a strategy agreed with Joe Cook to pursue regn of cefaclor in various markets as a preventive measure so as to allow flexibility.
>
> I just listened.

Zenith Ex. 36. On July 5, 1994. Voris forwarded the message to Taurel, Michael Eagle, Lilly's Vice President of Manufacturing, Gerhard Mayr, Lilly's President of European Pharmaceutical Operations, and Mark Foglesong, an executive director at Lilly. *Id.* He added:

> For everyone's information, at the last visit I made with Joe Cook to ACS Dobfar in late summer of '93, we informed Marco we did not want him to supply his U.S. generic partners with our material. Unless, there were subsequent discussions (or which I am unaware but could have easily happened), this is not something supported from the GPU.
>
> Mark, could I ask you to get to the bottom of this through the group that has everyday contacts with Marco. Supplying materials we own to others without a senior management sign off is not acceptable.

*Id.* Finally, the message was forwarded one more time, this time to Joe Hunt, stating, "In Mark's absence, are you the right person to followup on this request?" *Id.* Hunt did followup and made the following handwritten notations on a printout of the email: "R/B [Ranbaxy] nucleus; not LLY matl [not Lilly material]."

According to Zenith, this email exchange is the record of a late summer 1993 agreement between Dobfar and Lilly to limit where Dobfar could sell its own cefaclor. Zenith Memo. at 11 n. 7. Zenith claims that this agreement furthers the aforementioned December 1990 illegal market allocation agreement. *Id.* at 11. On their face, the emails discuss whether Dobfar is violating Lilly's clearly legal prohibition on Dobfar's use of Lilly materials without permission. Hunt's followup reaches a conclusion on this problem. Namely, he determined that the Ranbaxy nucleus was being used, not Lilly materials. Zenith's interpretation of the emails is at best overzealous. A reasonable jury could not find that the emails were direct evidence of an antitrust conspiracy.

Zenith further alleges that Lilly and Dobfar agreed to fix Dobfar's cefaclor prices. Zenith Memo. at 12. Some explanation of Zenith's evidence is needed to understand the argument (suggesting that this evidence is not especially "direct"). In January 1993, under an outsourcing agreement, Dobfar began toll manufacturing Ranbaxy zwitterion nucleus into bulk cefaclor for Lilly. In December of 1993, according to Zenith, Lilly and Dobfar also began negotiating for Dobfar to purchase Ranbaxy nucleus and cefaclor toll manufactured by Dobfar, originally intended for Lilly, from Ranbaxy nucleus.[11] In late

---

11. The evidence on this point is equivocal. Zenith cites a January 13, 1994 memo from J. Greg Davis at Lilly to Eagle, Foglesong, Voris, and others in which Davis writes:

> Patrick Fourteau is holding on-going negotiations with Marco Falciani, president of ACS Dobfar, for the purchase of 7–ACCA or cefaclor. Marco has expressed interest in purchasing 5–10 tons annually for final sale

December 1993, Marco Falciani, Patrick Fourteau and other Lilly employees discussed Lilly's future relationship with Dobfar. This meeting was summarized in an email from Mark Wise to Perry, Pytynia, Voris, and others. Zenith Ex. 38. In the email, he wrote, "all marketing, pricing of materials to acs [Dobfar] and marketing and pricing of products from acs for new or existing markets will be directed to Patrick Fourteau or a designee of Patrick's in Geneva". *Id.* Zenith argues that the pricing of products from Dobfar included cefaclor manufactured by Dobfar from Ranbaxy nucleus that Dobfar purchased from Lilly. Zenith Memo. at 13. Because Lilly never owned this cefaclor, these discussions were price-fixing, according to Zenith. *Id.* at 13–14. However, that interpretation of the email is too convoluted to constitute direct evidence. It is unclear, at the time of the email, whether an agreement between Lilly and Dobfar for Dobfar's purchase of Ranbaxy nucleus, even existed. Instead, the language of the email quite directly lends itself to the perfectly innocent interpretation that there was a need to negotiate the price of products being sold or transferred from Dobfar to Lilly. Like most of Zenith's "direct" evidence of a conspiracy between Lilly and Dobfar, this email falls short of that mark.

■ Zenith also points to the relationship between Lilly and Ranbaxy. Zenith maintains that they were engaged in illegal territorial and customer allegation agreements. To support this proposition, Zenith characterizes as direct evidence a memorandum prepared by Foglesong and John Voris, two executive directors at Lilly, dated January 19, 1994, and sent to Eagle, a Lilly vice president, and Taurel. Zenith Ex. 56. In the memo, the authors write, under the heading "Regional Programs," "Ranbaxy is free to sell material into any market where Lilly patents have expired." Zenith interprets the placement of this statement under the heading "Regional Programs," rather than under the heading "U.S." as evidence that Lilly and Ranbaxy entered an illegal agreement where Ranbaxy would not be allowed to sell cefaclor in the United States. Zenith Memo. at 18. This argument is unpersuasive. As of January 19, 1994, Lilly's patent on the cefaclor nucleus was still in effect in the United States. Placing the statement "Ranbaxy is free to sell material into any market where Lilly patents have expired" under the "Regional Programs" heading rather than under the "U.S." heading was a simple statement on the state of facts in light of applicable patent law.

Zenith also points to the entry, under the heading "U.S.," that "Lilly has agreed to help distribute a Ranbaxy labeled Cefaclor to specific customer segments that are not in Lilly's normal distribution channel" as evidence of an illegal customer allocation agreement. Without more explanation from Zenith, the Court cannot determine that such an agreement is illegal. Under antitrust law, in certain situations, Lilly cannot prevent Ranbaxy from selling cefaclor in a certain market, but they are under no obligation to *help* them in this endeavor. Zenith's argument that Lilly and Ranbaxy were violating antitrust law is based on an interpretation of this

into select eastern European markets and/or China. Negotiations are proceeding slowly as Patrick and others fear that sales to Marco might cannibalize Lilly sales. Negotiations are centered around a sales price of $1,200 per kilo, which leaves Marco with little or no margin. No volumes (beyond 2 tons scheduled for sale in 1994) have been committed to Marco at this time. Zenith Ex. 166. The memo mentions neither when negotiations began nor Ranbaxy. As Lilly notes, the actual sale of Ranbaxy-produced nucleus to Dobfar did not take place until after December 1993. Wise Aff., ¶ 7.

memo with which a reasonable jury could not agree.[12]

■ Since Zenith's reasonably-interpreted direct evidence does not cover the entire time period for which it alleges illegal conspiracy, the remainder of Zenith's summary judgment argument must rely on circumstantial evidence. "Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For this reason, the examination of circumstantial evidence in antitrust cases takes on the burden-shifting character found in many other areas of law. The Seventh Circuit delineates the analysis as:

> [t]he court should first examine the plaintiff's evidence of a conspiracy among the defendants. Next it should examine whether the defendants have offered evidence tending to show that the conduct complained of is as compatible with the defendants' legitimate business activities as with illegal conspiracy. If the court concludes that the foregoing analysis leaves the evidence of conspiracy ambiguous, it should then determine whether the plaintiff can point to any evidence that tends to exclude the possibility that the defendants were pursuing their legitimate independent interests.

*Reserve Supply Corp.*, 971 F.2d at 49.

Zenith offers three classes of circumstantial evidence to demonstrate conspiracy among Lilly and Dobfar. They include (1) Lilly's assessment of likely competition in light of its knowledge as to whether Dobfar would sell generic cefaclor in the U.S.; (2) Lilly's alleged reasons for the outsourcing agreements with other companies, including Dobfar and Ranbaxy, dis-

cussed above; and (3) Dobfar's provision of market intelligence to Lilly. We address them each in turn.

Zenith notes that while Dobfar was always identified as a possible manufacturer of bulk cefaclor by Lilly, Dobfar was not identified as a possible *competitor* of Lilly beginning in September of 1993. Zenith Memo. at 21. Zenith cites a document from Gayle Crick, at Lilly, to Perry and others listing "alternative scenarios" for the "competitive forecast." Zenith Ex. 7. The companies listed are Opos and Ranbaxy. *Id.* Dobfar is left out. *Id.* Zenith claims that Lilly determined that it had nothing to fear from Dobfar because of their illegal agreement. Zenith Memo. at 22–23. Zenith then presents clear evidence that Lilly would certainly know if it should expect competition from Dobfar because it closely monitored the possibility that Dobfar would sell cefaclor in the United States. For instance, a June 13, 1994 email from Joe Hunt to a number of Lilly executives, including Foglesong, Voris, and others mentioned earlier, discusses this issue under the heading "Rumored Connection Between ACS and Zenith." Zenith Ex. 33. Mr. Hunt first reports the rumor that Zenith would get cefaclor from Dobfar and that he followed up on this rumor with Falciani of Dobfar. Mr Hunt concludes that "[Marco Falciani of Dobfar] assured me that LLY would be told before any deals are cut or commitments made" with regard to Zenith's possible sale of cefaclor for use in the United States. *Id.* Likewise, a September 15, 1994 email from Perry to other Lilly employees carries the subject line, "fyi ... Cefaclor Rumor/Lederle to ship product Early Nov." Zenith Ex. 45. In the email, Perry speculates as to the source of Lederle's bulk cefaclor and eval-

---

**12.** Zenith makes a few similar proffers of "direct" evidence. We will not discuss them here, other than to note that we find their interpretations of the documents similarly convoluted and unpersuasive.

uates Dobfar by stating, "Sales based upon ACS Dobfar bulk ... FDA approved but highly unlikely source. (ACS has more to lose than gain)." *Id.* (ellipsis in original). Zenith argues that these and other communications are signs that Lilly and Dobfar had an agreement that Dobfar would not sell any cefaclor in the U.S. other than to Lilly even if the process for making the cefaclor did not use Lilly processes or other property. Zenith Memo. at 21. Lilly responds that such memos are part of the perfectly legal monitoring of Dobfar that Lilly had to do in order to enforce § 10.1 of its M.S.A. § with Dobfar that prohibited Dobfar from using Lilly know-how and compounds to make cefaclor for other concerns. Lilly Opp. at 30–31.

As to the second category of evidence, Zenith demonstrates that outsourcing cefaclor production was quite expensive for Lilly and argues that Lilly's willingness to undertake the expense was economically irrational if done for any purpose other than to prevent Dobfar and Ranbaxy from entering the market as suppliers of bulk cefaclor to other companies. Zenith Memo. at 23–28. Lilly does not dispute that its contracts for cefaclor production were a bit expensive. However, with regard to Ranbaxy, Lilly points out that it received import credits in return, which it needed to do business in India. Lilly Opp. at 31. As to the Dobfar expenditures, Lilly maintains that its "intent in outsourcing to ACS Dobfar was not to obtain cefaclor intermediates at the lowest possible cost. Rather, it was to maximize its total production of cefaclor and Lorabid [13] at the lowest possible combined cost." *Id.* at 32.[14]

Finally, Zenith presents evidence that Dobfar provided market intelligence to Lilly about other possible bulk cefaclor manufacturers. *See, e.g.,* Zenith Exs. 90, 91, 98. Zenith argues that this sharing of information is not something that would occur among competitors, but only among partners in an endeavor to hamper generic cefaclor competition. Zenith Memo. at 28–29. Lilly argues that these communications are consistent with its legitimate contractual agreement with Dobfar on the basis that "[t]he more cefaclor Lilly sold, the more intermediates it would buy from

---

13. Lorabid is the brand name of the antibiotic, loracarbef, which Lilly developed in the late 1980s and early 1990s. Lilly's Stm. of Facts, ¶¶ 13–16.

14. On this basis, Lilly also argues that the per se rule, which we address later, does not apply. Specifically, Lilly cites *Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185, 188–89 (7th Cir.1985) for the proposition that its arrangement with Dobfar was "ancillary"—part of larger procompetitive endeavor that the agreement promotes—at the time of its adoption. Lilly Memo. at 6–7. According to Lilly, Lilly needed outside production of bulk cefaclor so that it could focus its resources on Lorabid production, but, at that time, no company, including Dobfar, could produce bulk cefaclor without using Lilly technology and material. The restrictions in the MSAs were necessary, goes Lilly's argument, to protect its know-how and input compounds. However, a flat prohibition on all cefaclor sales, as contained in the M.S.A. § included as Zenith Ex. 200 (and possibly maintained as a *de facto* agreement after the M.S.A. § was revised), goes far beyond the need to protect Lilly's technology. The situation in *Polk Bros.* was quite different. There the restrictions prohibited Forest City from selling major appliances and furniture and Polk Bros. from selling lawn mowers, building materials and related items at the building they built to house both businesses on one plot of land. *Polk Bros.*, 776 F.2d at 187. The procompetitve aspect of the agreement was that it permitted them to combine their resources to create a one-stop shopping center for home improvement. The agreement was well-tailored to the task in that it did not limit what the parties could sell at other locations. *Id.* By limiting *all* cefaclor sales by Dobfar, the Lilly–Dobfar contract goes one step too far, thereby defeating Lilly's argument that the agreement was ancillary.

ACS Dobfar, and the more money ACS Dobfar would make." Lilly Opp. at 33.

The above discussion demonstrates that Lilly has offered evidence that its conduct was consistent with legitimate business activities, as opposed to illegal conspiracy. It remains to be seen if any of Zenith's evidence "tends to exclude the possibility that the defendants were pursuing their legitimate independent interests." *Reserve Supply Corp.*, 971 F.2d at 49. To begin this analysis, we note that Zenith does "not have to exclude all possibility that the defendants acted independently because 'that would amount to an absurd and legally unfounded burden to prove with 100% certainty that an antitrust violation occurred.'" *Alexander v. Phoenix Bond & Indemnity Co.*, 149 F.Supp.2d 989, 999 (N.D.Ill.2001) (citations omitted). The second category of evidence, analysis purportedly showing that Lilly's supply contracts were economically irrational, does not advance Zenith's claim. As noted above, Lilly offered an explanation demonstrating that its supply contracts were legitimate business arrangements in light of its need to produce Lorabid. In its response to Lilly's Statement of Additional Facts, Zenith does not offer evidence that Lilly did not produce Lorabid or that it was not easier to outsource cefaclor and move its own capacity to Lorabid production, as Lilly contends. *See, e.g.* ¶¶ 197–200 Zenith only objects that these facts are irrelevant, *id.*, which they are not under the burden-shifting analysis required by *Reserve Supply Corp.*[15]

The other two categories of evidence lend substance to Zenith's position. While it is true that Lilly offers its own explana-tion, we find that the cumulative weight of such evidence tends to cast serious doubt on Lilly's picture of the evidence. In addition, in light of the direct evidence of conspiracy found in the M.S.A. § expressly prohibiting cefaclor sales, a reasonable jury could determine that, despite redrafting of the contract in September of 1991, the parties maintained a *de facto* agreement in restraint of trade. Lilly argues that "evidence of informal communications among several parties does not unambiguously support an inference of conspiracy." Lilly Opp. at 33 (quoting *Market Force, Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1173 (7th Cir.1990)). Lilly's cite of the general principle is correct, but there is more evidence to this case than in *Market Force* where the alleged co-conspirators had simply circulated their policy statements among each other. Here, we have documents possibly alluding to illegal agreements-i.e., "ACS has more to lose than gain" in reference to whether Dobfar may be supplying another cefaclor manufacturer. Admittedly, "[t]he document is subject to interpretation . . . , but the interpretation of ambiguous documentary evidence of collusion is for the jury." *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 788 (7th Cir. 1999).

Therefore, on this ground, neither party is entitled to summary judgment. Lilly did not meet its burden of demonstrating that there is no genuine issue of material fact with regard to whether there was an agreement or agreements in restraint of trade. Zenith presented direct evidence for only a very brief period of the alleged conspiracy and must make its case to the

---

**15.** As Lilly admits, Lorabid did not turn out to be the blockbuster Lilly had hoped it would be, Lilly Opp. at 5–6, but a bad business decision is not the same thing as an illegitimate business decision. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 662 (7th Cir.1987) ("that [defendant] was 'punished' for its decision through subsequent poor sales does not mean it connived with or was influenced by the [alleged co-conspirators] in making the decision").

jury based on circumstantial evidence in order to meet this burden for the duration of the alleged conspiracy. In addition, two more elements of the antitrust claim must be examined.

**Resultant Unreasonable Restraint of Trade in the Relevant Market**

■ "There are two standards for evaluating whether an alleged restraint of trade is unreasonable: the rule of reason and the *per se* rule." *Denny's Marina,* 8 F.3d at 1220 (citations omitted). Under the rule of reason, the market must be defined, and it is necessary to determine whether the defendant has market power. *Polk Bros., Inc. v. Forest City Enterprises, Inc.,* 776 F.2d 185, 191 (7th Cir.1985). The per se rule does not require this analysis on the ground that certain types of agreements have such "substantial potential for impact on competition," that "damage to the market is presumed." *Denny's Marina,* 8 F.3d at 1221–22 (quotation omitted). Rather than undertake the analysis required if the rule of reason applies, Zenith concedes that issue and argues that the per se rule applies.

We examine whether Zenith's contention that the per se rule applies has merit. Whether an alleged restraint of trade should be evaluated under the per se rule or the rule of reason depends on the nature of the contract. *Polk Bros.,* 776 F.2d at 188. Zenith alleges that Lilly and Dobfar engaged in a horizontal market allocation, which is a type of agreement clearly falling under the per se rule. Lilly does not dispute that horizontal agreements between competitors to allocate territories are illegal. Lilly Reply at 5; *See United States v. Topco Assoc., Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972)

("One of the classic examples of a *per se* violation of Section 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition."). Instead, Lilly argues that Zenith mischaracterizes the nature of the agreement. Lilly Reply at 12. Specifically, Lilly argues that its relationship with Dobfar was vertical, rather than horizontal, and, therefore, subject to analysis under the rule of reason. Keeping in mind that "we should not throw labels like *per se* around loosely, without some appreciation for the economic arrangement we are evaluating," *Generac Corp. v. Caterpillar, Inc.,* 172 F.3d 971, 977 (7th Cir.1999), we determine whether the arrangement between Dobfar and Lilly was horizontal or vertical.[16]

Zenith contends that both Lilly and Dobfar could supply non-infringing bulk cefaclor for generic sales, making them competitors. Hence, as Zenith's argument goes, an agreement prohibiting Dobfar from supplying bulk cefaclor, such as was the case during at least part of the period covered in Zenith's claim, is a horizontal agreement. Zenith's statement of the law is exactly correct. *See In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 682, 700 (E.D.Mich.2000) ("An arrangement is said to be 'horizontal' when (1) its participants are ... actual rivals at the time the agreement is made ... and (2) the agreement eliminates some avenue of rivalry among the participants.") (internal quotations omitted). The question is whether Dobfar was a competitor of Lilly's. It is clear that Dobfar need not have been already selling bulk cefaclor in the market, just that it needs to have been capable of doing so at the time. *See, e.g. Cardizem,* 105

---

**16.** We consider this question with regard to the M.S.A. § memorialized in Zenith Exhibit 200, which is clearly an agreement in restraint of trade, and with regard to the time period covered under the later MSA, although we recognize that, for these years, the jury's consideration of the circumstantial evidence will determine whether the agreement restrained trade.

F.Supp.2d at 700 (finding that generic drug manufacturer was competitor of brand name manufacturer when generic manufacturer had considerable capability and interest to enter the market, but had not yet done so). Potential competitors cannot stifle nascent competition by entering into an agreement restraining trade. *Id.* (potential rivals cannot eliminate an "avenue of rivalry" through agreement).

Lilly correctly notes that, as of the date of the contract between Lilly and Dobfar on June 27, 1990, Dobfar was not making commercial quantities of bulk cefaclor without infringing Lilly's process patents. Lilly's Stm. of Add'l Facts, ¶ 213 (citing Pike Depo. at 62). However, there is more to this issue than Lilly acknowledges. We agree with the reasoning of the First Circuit that Zenith need show only that it "had the necessary desire, intent, and capability to enter the market at [Lilly's] level." *Engine Specialties, Inc. v. Bombardier, Ltd.,* 605 F.2d 1, 9 (1st Cir.1979). In that case, one of the alleged co-conspirators had not yet manufactured minicycles (the product at issue) when the agreement was made, but had developed a prototype and was ready to press ahead with production of the vehicles. *Id.* If such circumstances did not constitute an illegal agreement, then rather than having an incentive to avoid anticompetitive agreements, potential antitrust violators would have an incentive simply to identify probable competitors earlier in the product development process.

Here, there are questions of just how far along the product development process Dobfar was and of whether its capabilities changed at any point during the duration of the contract between Lilly and Dobfar. Lilly argues that "whatever cefaclor ACS Dobfar had produced—using any of several purportedly available process—it had produced only experimentally." Lilly Surreply at 3. In support of its position, Lilly

cites the testimony of Fred Perry that as of February 10, 1990, Dobfar was "evaluating several approaches [to cefaclor production] in the laboratory," at least one of which allegedly did not infringe Lilly patents. Perry Dep. at 64. According to Lilly, this stage of laboratory development is far from preparedness for commercial production. Zenith, on the other hand, argues that Perry, and thereby Lilly, recognized that Dobfar "had an interest in making and selling cefaclor." *Id.* at 39. Based on our reading of the voluminous exhibits filed in support of Zenith's position, Zenith will have difficulty making the case that Dobfar and Lilly were competitors with respect to the production of bulk cefaclor, but Zenith has created a genuine issue of material fact and will be permitted to present its side of the story to a jury.

Finally, Lilly argues that even if Dobfar and Lilly were competitors with respect to the production of bulk cefaclor, their agreement was vertical, rather than horizontal. Lilly relies on *Generac,* 172 F.3d at 977, to make this argument. The Seventh Circuit ruled that the per se rule did not apply to an agreement between Caterpillar, the owner of the standby generator trademark "Olympian," and Generac, the manufacturer of trademark Olympian generators for supply to Caterpillar and for its own sales. *Id.* The court reasoned that their relationship was vertical, not horizontal because:

> [e]ven though in some ways the companies may have operated in similar lines of business, this particular agreement was a vertical one in which Generac played the role of "supplier" and Caterpillar both upstream supplier of the trademark, and downstream purchaser of the finished goods.

*Id.* Lilly analogizes, arguing that Dobfar played the role of supplier of the cefaclor nucleus and Lilly played the role of suppli-

er of the patented manufacturing process and downstream recipient of the finished good of the cefaclor nucleus. Lilly Reply at 12. This analogy is cunningly attractive, especially since the *Generac* contract prohibited Generac from selling even non-Olympian standby generators in many markets, which makes it appear similar to the prohibition on Dobfar selling any cefaclor product to any third party.

Further inquiry detracts from the appeal of this analogy. In the Seventh Circuit case, only Generac produced Olympian generators, but both Generac and Caterpillar sold them. If Generac wanted to sell more Olympian generators, it could sell them in its own markets. The situation is reversed here. According to Zenith's presentation of the facts, there were two producers of bulk cefaclor, Dobfar and Lilly, but only one seller, Lilly. If Dobfar produced more cefaclor, it could only sell it to Lilly. In *Generac*, 172 F.3d at 978, the Seventh Circuit concluded that "no credible story of lowered output or increased price can be told on the basis of these [contractual] provisions." The same cannot be said of the controversy before us. Because Dobfar could only sell to Lilly, Lilly, unlike Caterpillar, had considerable say over how much bulk cefaclor was available to the market and how much consumers would pay for it. In addition, the contract in *Generac* included provisions allowing for Generac to increase its distribution areas if there was evidence that a Caterpillar dealer was not performing satisfactorily. *Id.* at 977–78. In contrast, no provisions were made, even under unusual circumstances, for Dobfar to undertake its own sales of what it produced without Lilly know-how and materials. *Generac* will not save Lilly's quest for summary judgment in its favor on the issue of horizontal agreements and the applicability of the per se rule.

## Presence of Antitrust Injury

■ The final required element for an antitrust claim is antitrust injury. *Denny's Marina*, 8 F.3d at 1220. Zenith must show that: (1) the alleged injury is the type of injury the antitrust laws were designed to prevent, and (2) the alleged injury "flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). To establish this element, Zenith argues that:

[a]s a direct and proximate result of Lilly's horizontal agreement with Dobfar to allocate the U.S. market for cefaclor to Lilly, Zenith suffered antitrust injury. Specifically, (1) the price of bulk cefaclor registration and commercial sale was raised, causing Zenith to pay more for bulk cefaclor; and (2) the restriction on supply of an essential output, bulk cefaclor, delayed Zenith's entry into the U.S. cefaclor market, causing Zenith to lose profits on lost sales.

Zenith's Memo. at 33–34.

Zenith alleges that Opos was able to charge it supracompetitive prices for Opos bulk cefaclor, from mid–1991 through mid–1995, because Opos had no competition. Zenith Reply at 11. Zenith blames this lack of competition on Lilly's illegal agreements with Dobfar and Ranbaxy and claims that Zenith would have contracted with one of these firms if not for the market allocation arrangements. *Id.* Zenith has stated the law correctly. Antitrust injury "requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." *Chicago Professional Sports Ltd. Partnership v. National Basketball Assoc.*, 961 F.2d 667, 670 (7th Cir.1992) (citations omitted). Restricting trade is analogous to raising prices. *Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir.1995)

("The analogy between price-fixing and division of markets is compelling. It would be a strange interpretation of antitrust law that forbade competitors to agree on what price to charge, thus eliminating price competition among them, but allowed them to divide markets, thus eliminating all competition among them.").

Whether Lilly had illegal agreements allocating markets with Dobfar and Ranbaxy has been extensively discussed above. The question here is whether Zenith otherwise would have been able to obtain bulk cefaclor from Dobfar and Ranbaxy and to convert it to cefaclor dosages for resale. The facts presented by both parties on this issue are equivocal. It is clear that Klein, on behalf of Zenith, unsuccessfully negotiated with InterChem to purchase Dobfar bulk cefaclor, beginning in 1989 and continuing until 1996. *See e.g.,* Klein Dep. (9/7/2000) at 52–53; Rome Dep. (9/26/200) at 37–40;[17] Lilly Exs. 64–66. Also, it is clear that the parties were never able to reach an agreement as to price and certain other terms. *See, e.g.,* Klein Dep. (9/7/2000) at 71–72. Lilly argues that it cannot be held responsible for antitrust injury when there is no way of knowing if the parties would ever have agreed on terms for the exchange. Lilly Surreply at 12. Lilly cites *In re Wheat Rail Freight Rate Antitrust Litigation,* 759 F.2d 1305, 1313 (7th Cir.1985), but this case will not help its cause. In *Wheat Freight,* any contract reached by the parties would have required approval by the Interstate Commerce Commission, which puts another layer of uncertainty into the mix. *Id.* Here, any agreement reached by the parties would have controlled the issue. Furthermore, it seems unfair to preclude Zenith from showing antitrust injury on the ground that any contract between Zenith and Dobfar is only hypothetical because they could not reach an agreement. The basis of an antitrust action is that Dobfar was playing by the illegal "rules" it arranged with Lilly such that almost any terms with Zenith would not have been agreeable to Dobfar.

Lilly also argues that Zenith cannot show antitrust injury because Zenith never had any trouble obtaining a source for cefaclor and because Zenith would not have been able to process any bulk cefaclor in addition to what it received from Opos. Lilly Opp. at 11; Lilly Surreply at 12. There is some evidence for both propositions. For instance, Zenith's president testified that Zenith had never received an order for cefaclor it could not fill. Klein Dep. (7/11/95) at 127. In addition, Sonja Indahl, Director of Purchasing at Zenith, testified that Zenith had various troubles, such as lab testing delays and packaging problems, with the production of cefaclor dosages. Indahl Dep. (8/24/2000) at 221, 235, 241. However, that Zenith could not get enough bulk cefaclor is not what Zenith claims as its injury. Zenith argues that it paid too much for the bulk cefaclor it did receive because Dobfar did not compete with Opos, due to Dobfar's alleged illegal agreement with Lilly. Because Zenith may be able to show that it paid higher prices for bulk cefaclor than it otherwise would have, Lilly is not entitled to summary judgment on this basis.

■ With regard to the second ground for injury, Zenith points out that Lilly's patent on the cefaclor nucleus expired on

---

**17.** In its Statement of Facts, ¶ IV. 9, concerning negotiations with InterChem for Dobfar bulk cefaclor, Zenith states, "Klein had more than 50 conversations with Pizza about obtaining Dobfar cefaclor." Lilly's response is as follows: "Admits only that Klein testified as to the alleged conversations, but denies that they occurred. Klein himself stated that he had no records of the alleged conversations." Lilly's Resp. to Zenith's Stm. of Facts, ¶ IV.9. Whether Klein is to believed on this issue is a question for the jury.

December 20, 1994. At that time, Zenith claims, it had the capacity and the ability to begin selling generic cefaclor nationwide if only Zenith had been able to purchase Dobfar's FDA-approved bulk cefaclor from InterChem. *Id.* at 33. Under this reasoning, its injury is that it was unable to enter the market due to Dobfar's refusal to sell its bulk cefaclor to Zenith. It is certainly true that a competitor who has yet to enter the market may suffer an antitrust injury. *Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 806 (D.C.Cir.2001) (citation omitted).[18] However, that "potential competitor must demonstrate both its intention to enter the market and its preparedness to do so." *Id.* (citation omitted). To enter a drug market, FDA approval is a prerequisite. *Id.* at 807 (citing 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug.")). Recognizing this requirement, Zenith claims that it would have had FDA approval of its cefaclor dosages on or before December 20, 1994 (when the patent on the cefaclor nucleus expired) but for the lack of approval of an approved source of bulk cefaclor—either access to Dobfar's product or approved of Opos's Abbreviated Antibiotic Drug Application ("AADA") for its product. Zenith Reply at 16.

To support its contention that lack of approval of its bulk cefaclor manufacturer's AADA was the only obstacle holding Zenith back, Zenith cites letters[19] sent to it by the FDA stating that their applications were insufficient because their "referenced bulk antibiotic has not yet been approved." Zenith Ex. 283, attach. 2. These letters were sent on January 11, 1995, about three weeks after Lilly's patent on the cefaclor nucleus expired. Since they cite failure of Opos to gain approval as the reason for not approving Zenith's application, they appear to uphold Zenith's characterization of the facts. The letters are misleading, however, because Zenith did not reference other key correspondence with the FDA. Most tellingly, on December 20, 1994, the *very same day* Lilly's cefaclor nucleus patent expired and Zenith alleges it was ready to enter the market, the FDA sent Zenith a letter stating, with regard to the cefaclor for oral suspension, that Zenith's waiver request had been denied because "[c]omparative dissolution profiles should be submitted for each strength, before a request for waiver of *in vivo* bioequivalence can be considered." Attach. D to Lilly's Resp. to Zenith's Stm. of Addt'l Evidence on Reply. This letter is part of series of letters alerting Zenith to such issues. *See id.* With regard to the bioequivalence problem, Zenith did not even respond to the FDA's concerns until January 27, 1995, more than a month after the patent expired. *Id.* While the Court recognizes that "[a]n antitrust violation need not be the sole cause of the alleged injuries, . . . the plaintiff must establish, with a fair degree of cer-

---

18. Zenith cites this case for support of its argument that delay in FDA approval caused by antitrust activity undertaken by the defendant can constitute antitrust injury. Zenith's Notice of Supplemental Authority at 2. The situation in *Andrx* is quite different from that before us. In *Andrx,* the Hatch Waxman Amendments permitted the defendant generic-manufacturer to delay the ability of other generic manufacturers to receive final FDA approval until after the defendant, as the first generic manufacturer, had been in the market for 180 days. *Id.* at 799. This statutory scheme, which played an important role in the appellate court's decision, is not at issue here.

19. More than one letter was sent because Zenith sought to register cefaclor in both oral suspension and capsule forms. Zenith Ex. 283, attach. 2.

tainty, that the violation was a material element of, and substantial factor in producing, the injury." *Greater Rockford Energy and Technology Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir.1993). By failing to provide facts showing that the bioequivalency problems were much less a factor in delaying FDA approval than was lack of approval of its bulk cefaclor, Zenith cannot claim that it would have been able to enter the market, but for its inability to purchase FDA-approved bulk cefaclor from Dobfar. In addition, not only does Zenith fail to offer an explanation for the period preceding January 27, 1995, it also fails to offer evidence establishing, with sufficient certainty, that bioequivalency did not remain an obstacle to FDA approval right up until its cefaclor applications were finally approved on April 27 and 28, 1995 one month after FDA approval of Opos's bulk cefaclor on March 31, 1995. As such, with regard to injury suffered from delay in entering the market, Zenith cannot raise a genuine issue of material fact.

### Conclusion

For the reasons set forth above, Lilly's summary judgment motion is *DENIED*, except as to Zenith's Second Amended Counterclaim (the New Jersey unfair competition claim), for which it is *GRANTED*. Zenith's motion for summary judgment is *DENIED*. Zenith's Motion to Strike also is *DENIED* as moot.